# United States Court of Appeals
## For the First Circuit

No. 11-1432

UNITED STATES,

Appellee,

v.

PATRICK DEHERTOGH,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Thompson, Circuit Judges.

Robert Herrick, by appointment of the court, for appellant.
Kelly Begg Lawrence, Assistant United States Attorney, with whom Carmen M. Ortiz, United States Attorney, was on brief for appellee.

October 19, 2012

**BOUDIN**, **Circuit Judge**.  Patrick Dehertogh seeks review of his conviction on a charge of conspiracy to collect debts by extortionate means, 18 U.S.C. § 894 (2006), and collection (or aiding and abetting collection, id. § 2) of debts by extortionate means, id. § 894.  The evidence, taken in the light most favorable to the verdict, supports the following outline of events.

In August 2008, real estate developer Michael Carucci sold, apparently at a substantial loss after renovations were taken into account, a Boston condominium that he had purchased with mortgage broker David Gefke.  Carucci assumed responsibility and gave Gefke a signed promissory note for $47,000, but failed to make the promised payments on time.  In January 2010, Gefke, in financial trouble and abusing drugs and alcohol, arranged to have a fellow regular at the South Boston bar he frequented--Michael "Mick" Lee--intimidate Carucci into paying the note.

Lee, in turn, recruited two close friends, Brandon Milby and the defendant Patrick Dehertogh.  There followed encounters with Carucci at which Lee, Milby, and Dehertogh were all present:

> - On January 29, 2010, Lee, accompanied by
> Milby and Dehertogh, met Carucci in his
> office.  While Milby and Dehertogh stood
> inside the closed door with their arms folded,
> Lee told Carucci that he owed "an awful lot of
> money on the street" and that things could
> either be "very easy or very difficult."  Lee
> then made a series of vague threats, such as,
> "I don't want to make your life uncomfortable
> at the Four Seasons," and, "I don't want . . .
> to go visit your home on the Cape."  Carucci,
> after denying that he had any money, made out

-2-

a check for $1,000 and later provided a second check for the same amount.

- On February 1, 2010, Lee, Milby, and Dehertogh went to the Four Seasons Hotel to confront Carucci, whose checks had bounced. While Dehertogh and a fourth man waited outside, Lee and Milby met with Carucci at the hotel's restaurant. More threats ensued, and Carucci surrendered his watch, promising before he left to hand over additional watches from his collection. Lee and Milby then rode off with Dehertogh and the other man, joking about how much they had frightened Carucci.

Thereafter, without Dehertogh's involvement, Lee and Milby continued attempting to collect from Carucci. Carucci, however, had reported Lee's threats to the Boston Police after the first encounter at his office. The FBI began investigating and ultimately worked with Carucci to record telephone calls he placed to Lee and Gefke. In early February 2010, the FBI arrested Gefke, Lee, Milby, and Dehertogh.

All four were indicted on extortionate debt collection charges in March 2010. Gefke and Lee pled guilty and agreed to testify against Dehertogh, who chose to go to trial. (Milby later pled guilty as well.) Dehertogh's trial began on September 27, 2010, and at the end a jury convicted Dehertogh on the two counts described at the outset of this decision. He was later sentenced to five years' imprisonment.

On this appeal, Dehertogh does not claim that the evidence presented was insufficient to show that he conspired to commit, and then participated in, extortionate debt collection.

Rather, he argues that his trial was tainted by the trial judge's rulings relating to allegations of juror taint and by supposed mistakes in the judge's instructions--or failure to give instructions--to the jury. We consider these matters one by one but find no reversible error.

Dehertogh lays most stress on the handling of the following incident. Shortly after closing arguments, the judge learned that when the courtroom clerk took the jurors out of the courtroom, "more than one juror said to [the clerk] that they had observed Brandon Milby in the courtroom and that he had been smiling on occasion and they were concerned." Milby in fact had been in the courtroom during Lee's testimony and jurors apparently were able to identify him from photographs introduced at trial.

The judge advised both sides of the courtroom clerk's report and, after pausing to confer with the clerk, added, "more than that," the jurors "feel intimidate[d] [and] scared." The judge suggested that he could address the matter with instructions to the jury but invited counsels' views as to whether this would be adequate and as to any proposed alternatives. Dehertogh's counsel urged that a mistrial was essential, summarizing his position thusly:

> [T]his is a case about fear. It's a case that the government says is about fear occasioned by the presence of somebody. Now you've got jurors saying they're intimidated by the presence of Mr. Milby. . . . [T]hat's what this case is all about. From my perspective,

this is a case about Mr. Dehertogh being in an office and somebody saying that intimidated him. And now the jurors, at least two or three jurors are saying they feel intimidated by the presence of one of the people who was in that office as well.

The government said that an instruction would suffice coupled with a collective invitation to the jurors to send a note to the judge if any of the jurors still had concerns. The judge said that he would follow this course provisionally but would reconsider the motion for a mistrial after the verdict if necessary. After asking Dehertogh's counsel if he could "improve upon the approach" suggested and receiving a negative answer, the judge called the jurors into the courtroom and gave them the following instruction:

> One or more of you has noted an individual in the courtroom whom you recognize as Brandon Milby . . . and have expressed concern about what he's doing here. . . . So, let me give you some instructions, I guess, and then I'm going to privately ask you a question.
>
> The instructions are this. I mentioned this once already. This is the case of the United States against Patrick Dehertogh. . . . Mr. Milby is not in custody. So, he's not in any sort of custody and whether or not there's any charges against him, you don't speculate about that. . . . Your concern is the case that the government has put on against Mr. Dehertogh. So, that's our focus here.
>
> Now, because Mr. Milby is not in custody, as a citizen he has every right to come in the courtroom and if he's interested in what's going on here he has every right to be here. Anyone has any right to be here.

. . . I can't shut those doors.  That would . . . violate the rights of the litigants and it would violate the public's rights.

So, while I'm, I'm not clear what your concern is, it's undoubted that was Mr. Milby and he was here and he was watching.

I will say something about your personal information, names, what we learn from you on the jury list. That's not disclosed.  That's not public.  And I'm ordering that it not be made public.  The lawyers see that in the choosing of the jury, but they're officers of the Court.  So I'm not making that public.

Now, that's all I'm going to say about this.  But since jurors, more than one, expressed a concern, what we'll do now is take a recess, about five minutes, and if any of you, I mean, search your consciences, honestly search your consciences, I'm not looking for an answer one way or another here, if any of you now, because this happened, and it did happen, if you have some concern about your ability to deliver a fair and an impartial verdict, fair to the government, equally fair to Mr. Dehertogh, what we call a true verdict, if you have any question about that, you don't have to explain yourself, just rip out from your notes that you do, and I need your name because I need to know who you are.

After a five-minute recess, the court confirmed, "we're all set to go, no notes."  The court then charged the jury, twice making clear that jurors were not to consider Milby's presence, including with a specific instruction to disregard "who was in the courtroom or who wandered in or who wandered out."  Additionally, the court replaced with an alternate the juror who had first informed the courtroom clerk about the concerns regarding Milby.

-6-

On appeal, Dehertogh presses his claim that the court's precautions were insufficient and that a mistrial was required because of Milby's presence. Our review of the court's handling of the incident is for abuse of discretion, United States v. Rodríguez-Ortiz, 455 F.3d 18, 23 (1st Cir. 2006), cert. denied, 549 U.S. 1143 (2007), taking account of both the importance of an impartial jury and the practical need for latitude when the district judge is coping with one of the many fact-specific problems that arise during trials, see United States v. Paniagua-Ramos, 251 F.3d 242, 249-50 (1st Cir. 2001).

Here, as a necessary first step to establish what had happened, United States v. Tejeda, 481 F.3d 44, 52 (1st Cir.), cert. denied, 552 U.S. 1021 (2007), the judge took it as settled that Milby was present and that whatever his precise behavior or countenance, some of the jurors perceived him as a threatening figure. A necessary further step is to consider whether what happened created a potential for prejudice, id., and, from both the judge's remarks and his decision that something should be done, he clearly concluded that such a potential existed.

The remaining question is whether the judge took reasonable and sufficient steps to guard against prejudice and whether, in light of what transpired, the judge acted reasonably in concluding that no further steps--such as conducting individual voir dires or declaring a mistrial--were necessary to secure a fair

-7-

trial for Dehertogh. See United States v. Bristol-Mártir, 570 F.3d 29, 42 (1st Cir. 2009). Treating Dehertogh's claims as adequately preserved, several different considerations persuade us that sufficient precautions were taken.

First, we begin with the nature and extent of potential prejudice. Dehertogh's own argument to the judge below captures the principal danger--not that the jurors would be coerced by threats, which might point toward acquittal, but that a perception of Milby as a threatening figure might make more vivid the government's depiction of Dehertogh. After all, the testimony made it appear that both Milby and Dehertogh were largely silent sentinels whose role in the collection scheme was conveying to Carucci a menacing aspect in support of Lee's threats.

Yet it is not easy to see how the jury could have avoided a similar, if less vivid, impression from the testimony alone. Having a couple of tough-looking characters stand silently by while veiled threats of violence are made in support of demands for money is practically a stock scene in movies, television and detective fiction with which few jurors could be unfamiliar. Dehertogh was himself present during the threats at Carucci's office and no other convincing explanation for his presence was ever provided to the jury.

Second, we must consider the adequacy of the jury inquiry. Here, the judge invited the jury to reflect briefly and

then to advise him individually if any of them remained uncomfortable; none did. This is not a perfect safeguard but it is a significant one, and short of a mistrial--which has disadvantages of its own--nothing is perfect once an untoward incident has occurred. The court's approach had the added benefit, if any jurors did come forward, of providing an opportunity to assess each concern and possibly replace a juror.

Some judges would have conducted an individual voir dire of each juror; others might believe that this might magnify to the jurors the importance of the incident. And while Dehertogh's counsel preserved his mistrial request, he did not express a preference for an individual voir dire as against a collective request. In all events, we think this choice was within the discretion of the district judge as a reasonable way to narrow those who might need to be privately interviewed.

Third, potency of corrective instructions is always a matter of speculation, but several of the points made by the judge in this case were sensible, specific and ought to have carried weight. One was that jurors were to focus on the admitted evidence against Dehertogh and that Milby was not on trial; another was that juror information was not public; and the last was that the jurors needed to reflect and tell the court if any concerns remained about their ability to serve impartially.

It is not clear why a juror who felt either compromised or personally threatened would be hesitant about saying so privately to the judge. To do so would not necessarily threaten the interests of or provoke opposition from jurors who wished to continue. And while one can always speculate about reasons why a juror might feel prejudice but desire to continue, this is not an obvious case to presume that an instruction would be useless.

In urging that a mistrial was required, Dehertogh relies on Remmer v. United States, 347 U.S. 227, 229 (1954), which discerned a rebuttable presumption of prejudice in a criminal trial where there occurs "any private communication, contact, or tampering directly or indirectly, with a juror . . . about the matter pending before the jury." The claim there--that an unknown person had offered a juror a bribe--is miles away from a spectator staring at the jury; and the quoted phrase, infinitely expandable, has been read with circumspection in later cases.

As we noted in United States v. Bradshaw, 281 F.3d 278, 287 (1st Cir.), cert. denied, 537 U.S. 1049 (2002), two later cases "cabined" Remmer--Smith v. Phillips, 455 U.S. 209 (1982), and United States v. Olano, 507 U.S. 725 (1993). Indeed, the circuits are divided on whether Remmer represents the current thinking of the Supreme Court. See United States v. Lawson, 677 F.3d 629, 643-44 (4th Cir. 2012) (collecting cases). This court continues to assume that a presumption of prejudice exists but only "where there

is an egregious tampering or third party communication which directly injects itself into the jury process." United States v. Boylan, 898 F.2d 230, 261 (1st Cir.), cert. denied, 498 U.S. 849 (1990).

Thus, in Tejeda, where jurors witnessed a courtroom spectator make a throat-slitting gesture, 481 F.3d at 48, we deemed the presumption inapplicable, id. at 51, and found that in any event the district court handled the situation properly by investigating the matter and taking steps to limit any prejudice, id. at 54. The district court took both these steps here and, if a serious possibility of prejudice ever existed, we think the absence of a juror response to the judge's invitation, coupled with the curative instructions, amply resolved the matter.

Dehertogh's other primary challenge on appeal is to the district court's jury charge. The court, after detailing the elements of collecting an extension of credit by extortionate means, explained aiding and abetting liability thusly:

> Now, suppose you think Mr. Dehertogh didn't do all these things himself but maybe he was in on it. The government has also charged him with being an aider or abettor to that conduct. . . . They have to prove that he knew, he, Mr. Dehertogh, knew that other people, in this case, . . . engaged in a criminal enterprise, a specific criminal enterprise, to collect credit or attempt to collect it by extortionate means.
> . . .
> And then the government has to prove that Mr. Dehertogh did something to make that crime come about. Not that other people did it, Mr.

-11-

Dehertogh did it. And the government argued that at one stage he was a lookout, and then they argued at an earlier stage by his presence he lent muscle to the situation. Well, if he did and he knew that's what he was doing, and he was doing that intentionally, whether or not they had agreed before, he's aiding in the commission of a criminal act and he's liable to the same extent as Mr. Lee or Mr. Gefke if you believe they set it up.

After the court charged the jury, Dehertogh's trial counsel objected to "using the government's theory of the evidence, specifically the lookout theory and the muscle theory" in the charge, because it sent "a message to [the jury] that that is in fact a credible interpretation." On appeal, Dehertogh enlarges the claim somewhat by saying that the instruction was unbalanced and that if the judge advanced the government's theory of the case, he should have advanced Dehertogh's as well.

Strictly speaking, it was up to the jury to decide whether deliberately lending an appearance of "muscle" or acting as a "lookout" was aiding and abetting, and it would have been cleaner to choose other illustrations than the evidence in this case to make clear that almost any act that contributes to the offense, if undertaken with a purpose to advance the crime, creates liability. But the judge was entitled to use such illustrations, see United States v. Hernández, 490 F.3d 81, 84 (1st Cir.), cert. denied, 552 U.S. 983 (2007), and any he used (or none at all) would have led the jury to the same conclusion.

Dehertogh was free to argue that he was present at Carucci's office with no intent to advance the crime or did not present a menacing appearance on that occasion, and free as well to argue that he had not been shown to have acted as a lookout at the hotel. Nothing in the judge's charge endorsed the government's gloss on the facts. But if the jury accepted that gloss, it surely comprised aiding and abetting, and if jurors understood the breadth of the aiding and abetting concept and accepted the government's evidence, they were sure to convict.

As for the alleged lack of balance, Dehertogh never asked the court to present his own theory of the case, but the district judge more or less did just this without being asked; after delivering the above-quoted language, the judge closed the aiding and abetting portion of the charge as follows:

> And before I leave this, it is not a crime to associate with people who are themselves criminals. It is not a crime to know that a crime is or will be committed and not to report it. It is a crime to want that crime committed and to do something, even as little as being a lookout, to help it be committed. That's aiding and abetting. But just being friends with or associating with the wrong people, even if you know they're committing a crime, doesn't make you a criminal and you're under no obligation to report it.

This made clear to the jury that mere association or presence, even with knowledge that a crime was taking place, did not constitute aiding and abetting; rather, Dehertogh had to take some step to "help" the crime and for that purpose ("to want that

-13-

crime"). This fairly presented both sides' differing positions as to how to interpret the evidence facing the jury. This is quite unlike United States v. Dove, 916 F.2d 41, 45 (2d Cir. 1990), cited by Dehertogh, where the instruction encouraged jurors to disregard eyewitnesses' failure to identify the defendant.

Lastly, Dehertogh raises a set of claims that, he concedes, were not preserved below, and so have to meet the stringent "plain error" standard. United States v. Albertelli, 687 F.3d 439, 445 (1st Cir. 2012). That test requires not only error, but also that the error be plain, that the likely outcome would have been different but for the error, and that an injustice would occur were the error not corrected. See United States v. Padilla, 415 F.3d 211, 218 (1st Cir. 2005) (en banc). All four conditions must be met. See id.

First, Dehertogh argues that the court failed to explain that he could be convicted only if the government proved that an alleged principal actually committed the underlying crime of extortionate debt collection. True, the aiding and abetting offense, unlike conspiracy and attempt, requires that the target crime have been completed, 18 U.S.C. § 2; and the court slightly blurred the point in saying that the government had to prove "that other people, in this case, . . . engaged in a criminal enterprise, a specific criminal enterprise, to collect credit or attempt to

-14-

collect it by extortionate means." Strictly, section 894 actus reus is simply collection or attempting to collect by such means.[1]

However, the district court had at the start of trial made clear to the jury that convicting Dehertogh as an aider and abettor required proof that "some person or persons" actually committed extortionate debt collection. And even if this were not so, no one could doubt from Lee's own testimony that <u>he</u> had committed the substantive offense. Thus, the jury could hardly have failed to convict if the judge had said more clearly that the collection crime or an attempt at it had to have been proved to have occurred. <u>See generally</u> <u>Neder</u> v. <u>United States</u>, 527 U.S. 1, 19 (1999).

Dehertogh's second claim concerns the district court's instruction on the elements of extortionate debt collection, which pertinently provided:

> Let's start with an extension of credit. That's a debt. It doesn't have to be evidenced by a promissory note. We are not concerned in this criminal case with how some civil case might come out and how the civil courts might adjudicate the liability of Mr. Carucci to Mr. Gefke. But the government's got to prove that in the circumstances Mr. Carucci was potentially or actually liable, he owed Mr. Gefke money. A debt, an extension of credit. Our society runs on credit. And it's

---

[1]The "enterprise" concept is central to the racketeering statute familiarly known as RICO, 18 U.S.C. §§ 1961-1968, which is often directed at extortionate debt collection; but no RICO offense was charged in this case.

perfectly legal. So, they've got to prove that. That's the first thing.

Collection of an "extension of credit" by forbidden means, 18 U.S.C. § 894, presupposes that such a debt exists, and Dehertogh argues that the district court's quoted instruction effectively told the jury to find that a debt existed here when it told the jury not to concern itself as to "how some civil case might come out and how the civil courts might adjudicate the liability of Mr. Carucci to Mr. Gefke." Once again, the instruction might have been cleaner if the statement of the elements had not mingled descriptions of the facts of this case, but no harm was done.

Nevertheless, Gefke and Carucci both testified that Carucci owed Gefke money; and the district court's instruction is best understood as telling the jury that it did not matter how litigation over the debt might come out. Dehertogh does not here claim that it would matter whether Carucci had some prospect of defeating a suit on the debt. And, while the existence vel non of such a debt was a matter for the jury if this was controverted, there is no likelihood that the jury--given the undisputed testimony from the creditor and the debtor--could have found that no debt ever existed.

The third and last supposed error Dehertogh claims is that the district court failed sua sponte to instruct the jury to disregard a specific sidebar exchange that Dehertogh claims the

-16-

jury overheard.  In the sidebar, the prosecutor said that she was leading Lee in her direct examination in order to avoid testimony that he had taken a trip to Cape Cod with Dehertogh "to engage in a drug transaction," prompting Dehertogh's counsel to "dispute that Dehertogh went down there to do anything illegal."

Dehertogh's counsel then informed the court that his partner, sitting in the back of the courtroom, had said earlier that "she could hear everything . . . at side bar" and apparently signaled that she could hear the ongoing sidebar as well.  But defense counsel made no request that the judge caution the jury to ignore anything it might have heard of the sidebar, nor is it certain that the jurors--told earlier that they were free to move around during sidebars--heard or understood the substance of what had been discussed.

There may be rare cases where the prejudicial effect of such a sidebar may be so evident and so extreme that the judge should offer cautions where none was requested; but this is hardly such a case.  The offense charged had nothing to do with drugs; defense counsel had denied that Dehertogh was involved in anything illegal; the judge had earlier warned the jury to ignore sidebar conferences; and, of course, any new caution to the jury might only have drawn attention to something that had passed unnoticed.

In planning their appeal, losing counsel are entitled to troll through transcripts to find alleged glitches in the

instructions or other phases of the trial.  But for sound reason the plain error rule creates a high threshold where the supposed missteps are ones that no one noticed at the time or, if noticed, thought worthy of a timely objection.  Whether error or no, none of the unpreserved claims here, singly or together, suggests that the outcome was affected.

<u>Affirmed</u>.