# United States Court of Appeals
## For the First Circuit
No. 17-1706

UNITED STATES OF AMERICA,

Appellee,

v.

GADIEL ROMERO, a/k/a "TC,"

Defendant, Appellant.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

———————————

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

———————————

Thomas J. O'Connor, Jr. for appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom Andrew E. Lelling, United States Attorney, was on brief,
for appellee.

———————————

October 12, 2018

———————————

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

Gadiel Romero pleaded guilty to conspiracy to commit kidnapping and got a 276-month prison sentence, a below-guidelines sentence — his guidelines range was 360 months to life. Ably represented on appeal by new counsel, Romero principally claims that his incarcerative term is both procedurally flawed and substantively unreasonable. Concluding, as we do, that his attacks miss the mark, we *affirm*.

**HOW THE CASE GOT HERE**

Because this appeal follows a guilty plea, we take the facts from the undisputed parts of the probation office's presentence report ("PSR") and the transcripts of the key court hearings. <u>See, e.g.</u>, <u>United States</u> v. <u>Edwards</u>, 857 F.3d 420, 421 n.1 (1st Cir.), <u>cert. denied</u>, 138 S. Ct. 283 (2017).

**Abduction**

Around 6 p.m. on July 23, 2012, masked gunmen abducted Manuel Amparo and Jose Daniel Felipe Castro near a house on Allston Street in Lawrence, Massachusetts. What happened is this. As Amparo and Castro pulled into the driveway in Amparo's car, a white van pulled in behind them and four men wearing masks and black t-shirts emblazoned "POLICE" charged out shouting "police." Three of the men had pistols and the fourth had a shotgun. One of the

men smacked Amparo on the side of his face and forced him and Castro into the van. The men then put a hood over Amparo's head and bound his feet and hands. The van sped off to Manchester, New Hampshire, it turns out. Responding to a 911 call from Amparo's wife, police found a plastic handcuff on the ground near Amparo's car and a GPS locator attached to the car's back bumper.

During the drive to the Granite State, Amparo was periodically beaten (this part of the PSR is phrased in the passive voice). The abductors eventually brought him and Castro to a house in Manchester. One of the abductors put Amparo on the phone with someone who threatened to kill him if he did not pay a ransom. An abductor also burned him with a hot iron and repeatedly punched and kicked him.

At some point that night, Amparo freed his hands and feet, removed his hood, and escaped through a window. He started knocking on the neighbors' doors, looking for help. Responding to the commotion, one neighbor called the police and said he had a man on his porch who claimed he had been kidnapped. This was around 4:30 a.m. on July 24.

### Investigation and Arrests

Arriving on the scene, officers heard from Amparo about his ordeal, including where he had escaped from. And they learned too that the suspects and another victim where still there. With

- 3 -

backup help, the officers headed to the location, freed Castro, and arrested Jose Guzman, Henry Maldonado, and Thomas Wallace. Searches (either with a party's consent or with a warrant) later revealed guns, police paraphernalia (badges, t-shirts with "POLICE" on them, handcuffs, *etc.*), Amparo's wallet, cell phones, and blood on the van's carpet.

During the investigation, law enforcement learned that Guzman, Maldonado, and Wallace participated in a Lawrence-area kidnapping gang led by Danny Veloz (nicknamed "Maestro") that also included Romero, Luis Reynoso, and Jose Matos. The crew focused on abducting drug dealers and holding them for ransom (in the form of cash or drugs). Guzman, Maldonado, Wallace, and Reynoso cooperated with the government. From their statements, a clear picture emerged of the Amparo/Castro abductions. Matos installed the GPS tracker on Amparo's car and stored uniforms and weapons used during the kidnapping. Veloz tracked the GPS data and clued the crew in on Amparo's whereabouts by calling Guzman. When Veloz said Amparo was near his Lawrence home, Guzman, Maldonado, Wallace, Reynoso, and Romero grabbed Amparo and Castro at gunpoint. Once at Maldonado's Manchester home, Veloz and Guzman continued to talk by phone throughout the evening as Maldonado tortured Amparo to get him to pay a ransom. Eventually, Wallace drove Reynoso and

- 4 -

Romero back to Lawrence (Maldonado and Guzman stayed with the two abductees) and then returned to Maldonado's home.

Beyond that, the cooperating witnesses also talked about a May 9, 2012 attempted kidnapping on Saratoga Street in Lawrence, and a July 8, 2012 kidnapping on Whiting Street in Lynn, Massachusetts. Guzman fingered Romero as part of the crew present on Saratoga Street for the attempted kidnapping (the attempt fell through when the police responded to reports of suspicious activity). Guzman and Maldonado also fingered Romero as part of the Whiting Street crew that kidnapped a drug dealer at gunpoint and kept him in Maldonado's basement (Guzman and Romero beat and kicked him, apparently) until the dealer's associate paid a ransom.

**Indictment**

After his arrest, a federal grand jury indicted Romero — along with Guzman, Maldonado, Wallace, Veloz, Reynoso, and Matos — for conspiring to "unlawfully seize, confine, kidnap, abduct, and carry away" two persons "and to willfully transport them in interstate commerce and hold them in ransom, in violation of" 18 U.S.C. § 1201(a) and (c). Reduced to its essentials, § 1201(a) punishes anyone who "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . when . . . the person is willfully transported in interstate or foreign commerce . . . ."

And § 1201(c) provides that "[i]f two or more persons conspire to violate this section and one or more of such persons do any overt act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life."  Romero initially pleaded not guilty to the charge.

### Recorded Conversation

During Romero's pretrial detention, his then-attorney gave prosecutors a letter that he said Romero had given him. Signed by Maldonado, the letter purported to recant his identification of Romero as a player in the July 23 kidnapping. Maldonado told prosecutors in an interview that he wrote the letter because Romero had threatened him by showing him a shank and having some guys tell him they knew where his family lived (Maldonado has a wife and two children).  A later search of Romero's cell uncovered a tooth brush sharpened to a point.

Maldonado agreed to wear a secret recording device and talk to Romero in prison about Romero's plan to have him recant his identification.  And the tape captured Romero inculpating himself in the July 23 conspiracy.  Here is a taste of what he said:

> I was the first one that hit [Amparo], 'Be quiet,' and then [Wallace] hit him hard. Bang! Bang! Bang! Holy shit! . . .    [Wallace] cracked him.  When I hit him . . . he bled a little bit, but when that dude hit him with the grip of the shotgun, . . . blood was spurting everywhere!  That poor [Reynoso] in the back . . . .

This is the third time I went to do something with [Reynoso]. . . . He's not built for that.

And while complaining about what Veloz had paid him for his participation, Romero also said:

I was out there doing my thing on my own too. Do you remember one time when he says to me [unintelligible], Oh, how did you buy that car? Not with you . . . . The most I ever see you with, motherfuckers is five stacks . . . . I went with another team and I make 50 stacks one night. One night, one hit. With [Veloz] it's 5, 5, 5. No more . . . . It's like, you don't want us to get fat, you want us to, like maintain and go.

The two then shifted to a discussion about the letter Maldonado had given his attorney. "Listen off the book," Maldonado began,

[Guzman's] the one . . . when we first, listen got when we first got, first got in the tank together, [Guzman's] — he's a dirty dude — all through this he told me, yo. . . . At first he tried to tell me in Spanish to tell [Veloz] to swear about everything about the guns and everything and then he said "Yo, . . . tell them that it was [Veloz] and [Romero] that put you up to all of this you heard?

"If you said this shit to your attorney," Romero responded, "I can leave." To that, Maldonado replied:

My man . . . I've . . . told them exactly everything that I wrote in the letter everything. Everything that you told me to tell him. Everything, and . . . I haven't still come face to face with the dude with the prosecutor but when I do come with the prosecutor even though I know he's gonna know that I'm lying it doesn't matter cause it's my word, you know what I'm saying.

"I don't know how . . . that shit works," Romero stated, "because if you already went to a grand jury . . . [a]nd you gave a

- 7 -

confession, then, they gonna hit you with perjury."  And later in the conversation, Romero said to Maldonado that "if you say . . . what you were just telling me . . ., that in the pen . . . [Guzman] said . . . 'We are going to say that it was [Romero] and [Veloz]' that thing gets me out of this mess . . . ."  "Everything you told me to say I'm gonna say," Maldonado stressed.  "I'm gonna tell my other lawyer that:  'Yo, [Romero] had nothing to do with . . . this and that.'"

Romero also brought up the alleged ransom with Maldonado.  Calling Amparo "a kilo carrier," Romero opined that the government will "need [Amparo] to go to court to testify."  But "if the guy is intelligent and he knows what happened," Romero added, "he won't go to court," because if he testifies about everything — how the crew put "a GPS under [the] car" and "ask[ed] for ransom money for [his] head" — the government will know "that [he was] doing something big," which would get the "feds" on him.

### Change of Plea

Represented by counsel, Romero attended a change-of-plea hearing where he switched his plea from not guilty of conspiracy to kidnap to guilty (he did so without a written plea agreement with the government).  Here are the highlights from that hearing.

Near the hearing's beginning, the judge noted that the statute the government alleged Romero conspired to violate

criminalizes the "knowing[] and willful[]" abduction of "a person with the intent to receive a benefit, usually in the form of a ransom or reward . . . ."  The judge also touched on the law of conspiracy, the details of which are not relevant here.  Romero said he understood.  And the judge discussed how federal sentencing works, noting in broad strokes that a court first calculates the applicable advisory-sentencing "range" — after accounting for the base "offense level," any "adjustment[s]" to the offense level, and the defendant's criminal history — and then considers various "factors" to come up with an appropriate sentence, whether within, above, or below the range.  "Ultimately," the judge said,

> I have to see . . ., as best as I can . . ., that justice is being done in the case, so there will be a [PSR] prepared.  It will be shared with you, obviously, with me and with the government, and where there are disagreements, we have a hearing, and that's where we have an opportunity to work out finally what satisfies me as a fair and just sentence, and, of course, you have an opportunity to participate in that process and to speak at [the] hearing as well.

Asked by the judge if he had any questions about sentencing, Romero answered that he did not.

Because he had to see if Romero accepted responsibility for committing the charged offense, the judge had the government summarize the evidence against him.  Among other details, the government emphasized that the crew had "held" the kidnapped victims, "and a ransom demand was made on one of [them] for his

release."  Romero did not dispute anything the government said.

Taking a belt-and-suspenders approach, the judge then repeated for

Romero's benefit the gist of the government's evidence — evidence

that included (in the judge's words) his being "part of an

agreement to kidnap" and transport a person across state lines

"with the intent to procur[e] a ransom for his release."  "[W]ere

you part of that agreement with Mr. Veloz and others?" the judge

asked Romero.  "Yes, sir," replied Romero, who then acknowledged

that he was "voluntarily" choosing to plead guilty.  And with that,

the judge accepted Romero's change of plea.

### Sentencing

After the change-of-plea hearing, probation prepared the

PSR, which recounted the pertinent facts in great detail.  And

among the facts described there was the ransom aspect of the

conspiracy.  For instance, the PSR noted that Amparo told the

police that Veloz threatened to kill him if he did not pay a

ransom.  The PSR also noted that the cooperating co-conspirators

(to quote the PSR) admitted that "the crew tried to get Amparo to

pay a ransom."

Because the conspiracy charged the kidnapping of two

distinct victims — Amparo and Castro — the PSR treated Romero's

conviction as two separate counts of conspiracy to kidnap.[1]  See USSG § 1B1.2(d).  The PSR set Romero's base-offense level for each count at 32, see id. § 2A4.1(a), and added 2 levels because he used a dangerous weapon, see id. § 2A4.1(b)(3).  On the conspiracy-to-kidnap-Amparo count, the PSR added 2 levels because Amparo sustained serious bodily injury, see id. 2A4.1(b)(2)(B), and 6 levels because of the ransom demand, see id. 2A4.1(b)(1).  The PSR then adjusted the base-offense level for each count upwards 2 levels for obstruction of justice (because Romero schemed to have Maldonado retract his identification).  See id. § 3C1.1.  All of this resulted in adjusted-offense levels for the Amparo and Castro kidnappings of 44 and 36, respectively.

Applying a multi-count adjustment, the PSR calculated a combined adjusted-offense level of 45.  See id. § 3D1.4.  The PSR then reduced that number 3 levels for acceptance of responsibility, for a total-offense level of 42, see id. § 3E1.1(a), (b) — which combined with Romero's criminal-history category of VI resulted in an advisory-sentencing range of 360 months to life in prison.[2]

_____

[1] Probation applied the 2016 version of the sentencing guidelines.

[2] Despite putting in a "request[]," probation had not received information about "whether a ransom demand was made specific to Castro and whether Castro sustained any injuries."  But probation said that, regardless, Romero's advisory-sentencing range "would not be impacted, and would remain 360 months to life."

Romero raised a multitude of objections to the PSR. As pertinent here, he disagreed with the PSR's recommended 2-level increase for obstruction of justice — his theory being that the recorded conversation contained "no indication . . . that [he] threatened, cajoled, forced, [or] enticed . . . Maldonado to do anything or corroborated any previous threats, cajoling[,] or force against Maldonado to do anything on . . . [his] behalf." Romero also insisted that he played only a minor part in the criminal activity and so should get a 2-level minor-role reduction. See id. § 3B1.2(b). He did not object to the 6-level ransom-demand enhancement, however.

Probation responded that even without the recorded conversation, a preponderance of the evidence supported the obstruction-of-justice enhancement given Maldonado's statement that he penned the letter recanting his identification after Romero (who had a shank) threatened him. And probation insisted that Romero should not get a minor-role reduction because he "played an active role in the abduction of the two victims at gunpoint." Probation also noted that the evidence suggested that Romero had a hand in the May 9 attempted kidnapping (on Saratoga Street) and the July 8 kidnapping (on Whiting Street). So probation concluded that the PSR properly assigned Romero's total-offense level of 42. And probation noted that even if the district judge agreed with

Romero on both objections, the total-offense level would be 38, which would still yield a recommended-sentencing range of 360 months to life.

Romero filed a sentencing memo. Noting that the PSR recommended a sentencing range of 360 months to life imprisonment, he asked for a 120-month term based on his minor role in the conspiracy, his not threatening Maldonado, and his "substantial" steps he had taken "toward rehabilitation." He did not mention the ransom-demand evidence, however.

In its sentencing memo, the government noted how cooperating co-conspirators "identified [Romero] as a member of a violent crew that kidnapped drug dealers for ransom" — like other crew members, he "disguised himself as a police officer, armed himself with a firearm, and abducted drug dealers for ransom." As for the kidnapping of Amparo and Castro, the government chronicled how "Amparo was tortured with a hot iron in Maldonado's home while Veloz demanded a ransom from him (Romero did not do the actual burning but was present when it occurred)." Romero was hardly "a minor player," the government emphasized — based on what the cooperating co-conspirators said, he was "an active, eager participant in a conspiracy to kidnap multiple drug dealers at gunpoint for ransom." And once caught, Romero "threatened" Maldonado, a cooperating co-conspirator, "causing Maldonado to

- 13 -

recant his identification of Romero." Still, the government recommended a 312-month prison stint, below the PSR's recommended range of 360 months to life.

At sentencing, the judge indicated that he had reviewed the PSR and the parties' memos. And he noted that Romero had "some" objections to the PSR. But because the government endorsed a 312-month sentence — a term below the recommended 360-months-to-life range "calculated by the Probation Office" — the judge was "not sure that those objections" were "all that relevant," since the government's proposal was "below" what Romero would get if he sustained the objections and reduced the offense level accordingly. The judge did not discuss Romero's objections any further, however. And Romero did not object.

The judge then asked for argument on the parties' "approach to the case and the recommendation." Obliging, the government discussed the conspirators' relative levels of culpability, emphasizing how Veloz, Guzman, and Romero "most deserv[ed] . . . the kind of substantial penalties" permitted "for this type of offense" because they were basically "in the business of kidnapping drug dealers for ransom." The government then contrasted these co-conspirators with Matos, who did not participate directly in the kidnappings, and with Maldonado, Wallace, and Reynoso, who did participate directly but on fewer

occasions and in roles "subordinate . . . to persons [who] were more experienced, or who had a leadership aspect to the case." Conceding Romero was not a leader of the crew — Veloz was "the overall leader," and Guzman was "the street leader or street boss" — the government noted that Romero had boasted in the recorded conversation with Maldonado that he was among the crew's more experienced members. This plus the cooperating co-conspirators' statements showed Romero "was engaged in this kind of activity on a regular basis."

"You can't imagine a more dangerous, violent kind of conduct," the government stressed in something of a final pitch — "charging out of vans armed with guns, kidnapping, torturing" (Romero did not put the iron on Amparo, the government conceded, but he was there when it happened), "[a]ll to extort a ransom paid in drugs or money." Yet despite the seriousness of the offense, the government supported a slight departure from the low end of the sentencing range because it thought Romero's criminal-history designation significantly overstated the seriousness of his criminal history. Which is why the government requested a below-guidelines sentence of 312 months.

Agreeing with the government's comment about Romero's criminal history, defense counsel asked for a sentence of 120 months. Counsel emphasized how Romero was not a leader, a

torturer, or a person responsible for securing the GPS device and equipping the crew. He also suggested that Romero's recorded statements to Maldonado amounted to mere bolstering and failed to show obstruction of justice. And he pointed out how Matos had gotten a 144-month sentence (Matos was the only co-defendant sentenced at that point), how the "national mean" sentence for kidnapping is 192 months, and how other defendants had received lighter sentences for similar offenses.

After considering the parties' extensive arguments, listening to Romero's statement (his "allocution," as it is called) where he professed to be a remorseful and changed man, and reviewing the pertinent sentencing factors, see 18 U.S.C. § 3553(a), the judge chose to impose a 276-month term. Explaining his decisional calculus, the judge noted that several factors cut in favor of a below-guidelines sentence, including that Romero — though "very important in the organization," as the government said — was not "the mastermind"; that his criminal-history category was "overstated"; and that he had accepted responsibility for his crime and "taken some positive steps" to rehabilitate himself. But measuring "the other side of the equation," the judge "agree[d] with the government that this was a violent, brutal[,] and reprehensible crime" for which "punishment is merited and earned." Also and importantly, in the statement-of-reasons form issued

- 16 -

after judgment entered, the judge checked a box indicating that he had "adopt[ed]" the PSR "without change."

Anyone wondering about Romero's co-conspirators' sentences:  After a jury's guilty verdict on the conspiracy-to-kidnap charge, Veloz got a life term.  After they pleaded guilty to conspiracy to kidnap, Guzman got a 192-month term, Maldonado a 156-month term, Wallace a 156-month term, and Reynoso a 131-month term.  And after he pleaded no contest to conspiracy to kidnap, Matos (as we said) got a 144-month term.

**OUR TAKE ON THE CASE**

That brings us to the present, with Romero's appeal challenging (as we noted) the sentence's procedural and substantive reasonableness.[3]

---

[3] Romero also argues — for the first time on appeal, engendering plain-error review — that the sentence violates his Eighth-Amendment right to be free from cruel and unusual punishment. He concedes that the case law is against him.  Still, he raises the issue to preserve it for possible Supreme Court review.  It is preserved, though (obviously) given the presence of authority contrary to his position, plain error is plainly missing here.  See, e.g., United States v. Morosco, 822 F.3d 1, 21 (1st Cir. 2016).

## Procedural Reasonableness

Broadly speaking, Romero believes the judge botched the sentencing-range calculation by giving him enhancements for ransom demand and obstruction of justice, and by denying him a reduction for minor participation. He also blasts the judge for not "expressly rul[ing]" on his objections to the PSR's handling of the obstruction-of-justice and minor-participant adjustments. The government, however, sees no reason for us to vacate his sentence. And we agree with the government.

### Standard of Review

We generally inspect a procedural-reasonableness claim for abuse of discretion, see United States v. Tanco-Pizarro, 892 F.3d 472, 478 (1st Cir.), cert. denied, 2018 WL 4361944 (2018) — a multidimensional test that requires us to assess "factual findings for clear error, arguments that the [sentencer] erred in interpreting or applying the guidelines de novo, and judgment calls for abuse of discretion simpliciter," see United States v. Trinidad-Acosta, 773 F.3d 298, 309 (1st Cir. 2014) (quoting United States v. Serunjogi, 767 F.3d 132, 142 (1st Cir. 2014)). Of course, when a defendant fails to preserve a procedural-reasonableness objection below, we review only for plain error. See Tanco-Pizarro, 892 F.3d at 478-79. And as everyone knows by now, the plain-error standard is a demanding one, requiring the

defendant to "show (1) error, (2) plainness, (3) prejudice, and (4) an outcome that is a miscarriage of justice or akin to it." Id. (quoting United States v. Edelkind, 467 F.3d 791, 797 (1st Cir. 2006)); see also United States v. Pires, 642 F.3d 1, 14 (1st Cir. 2011) (calling the plain-error standard "daunting").[4] But when a party intentionally relinquishes or abandons an argument, we deem it waived, meaning it is unreviewable. See, e.g., United States v. Coleman, 884 F.3d 67, 71 (1st Cir. 2018).

*Ransom Demand*

We start with Romero's complaint with the ransom-demand enhancement — a complaint he débuts here, so our review is at best limited to plain error. Section 2A4.1(b)(1) of the guidelines calls for a 6-level increase "[i]f a ransom demand or a demand upon government was made . . . ." In Romero's telling, that increase only applies if a kidnapper makes a ransom demand to someone "other than the victim." To support his thesis, he relies

_____

[4] "[F]or sound reason," we have said, "the plain error rule creates a high threshold where the supposed missteps are ones that no one noticed at the time or, if noticed, thought worthy of a timely objection." See United States v. Dehertogh, 696 F.3d 162, 170 (1st Cir. 2012). For example, this "exceedingly tough" standard keeps the parties from hiding problems below — which could've been fixed then and there — so that they might argue error here. See Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 80 (1st Cir. 2010).

- 19 -

on a Seventh Circuit case, United States v. Reynolds, which held that "§ 2A4.1(b)(1) may be applied only if kidnappers' demands for money or other consideration reach someone *other* than the captured person." See 714 F.3d 1039, 1044 (7th Cir. 2013) (internal quotation marks omitted). And because the PSR indicates only that a ransom demand was made to Amparo himself, his argument continues, the judge had no business applying the ransom-demand enhancement. This matters, he submits, because without that enhancement his sentencing range would be 324 to 405 months, not 360 months to life. See USSG Ch. 5, Pt. A (sentencing table) (setting a sentencing range of 324 to 405 months for persons with a criminal-history category of VI and an offense level of 36). Though artfully framed, his argument fails for several reasons.

For openers, and to repeat, Romero pleaded guilty to an indictment charging him with infracting 18 U.S.C. § 1201 by (emphasis ours) conspiring to kidnap two persons, transporting them interstate, and holding them "for *ransom*." At his change-of-plea hearing, remember, he admitted (no ifs, ands, or buts) that the government's version of events added up to a § 1201 violation — a version that prominently featured his having played a role in a kidnapping conspiracy where (double emphasis ours) "the victims were held and *ransom demand was made **on one of the victims** for his release*." And by agreeing with the government

- 20 -

that he violated § 1201 when a ransom demand "was made" only on the kidnapped "victim[]," Romero arguably waived his current claim that no ransom demand was ever made because the demand did not reach a third party. See generally United States v. Walker, 538 F.3d 21, 23 (1st Cir. 2008) (holding that a defendant waived any right to claim as error a sentencing rationale that she had agreed to in the district court); United States v. Turbides-Leonardo, 468 F.3d 34, 37-38 (1st Cir. 2006) (emphasizing in a similar context that "a defendant who eschews a warrantable objection" to a sentencing enhancement "lulls both the prosecution and the sentencing court into what will prove to be a false sense of security if he is later allowed to do an about-face").

But even assuming, favorably to Romero, that the claim is not waived, we discern no plain error. To win under this standard, Romero must show (among other things) that the judge committed an "indisputable" error by (for example) flouting governing precedent or the guideline's clear text — such a showing would satisfy plain error's plainness prong, the case law holds. See United States v. Jones, 748 F.3d 64, 70 (1st Cir. 2014); see generally United States v. Olano, 507 U.S. 725, 734 (1993) (explaining that "plain" error is "synonymous with clear or . . . obvious" error (internal quotation marks omitted)). This he has not done, however.

Romero pins his plain-error hopes to the Seventh Circuit's Reynolds decision, which (as we noted) held that "'ransom demand' under § 2A4.1(b)(1) requires that a demand be made to a third party." See 714 F.3d at 1044 (bold-face type and capitalization omitted). But Reynolds does not — repeat, does *not* — control us, a fact that pokes a huge hole in his Reynolds-based argument. See United States v. Richard, 234 F.3d 763, 771 (1st Cir. 2000) (finding no plain error even though a majority of circuits had adopted the interpretation of a statute urged by the defendant); see also United States v. Caraballo-Rodriguez, 480 F.3d 62, 70 (1st Cir. 2007) (same).

Still trying to bring his claim within the sphere of controlling precedent, Romero notes that Reynolds cited a case of ours, United States v. Alvarez-Cuevas, 415 F.3d 121 (1st Cir. 2005). But his effort is for naught.

Alvarez-Cuevas interpreted a different subpart of § 2A4.1 — (b)(6), not (b)(1). As Alvarez-Cuevas said, subpart (b)(6) tells sentencers to jack up a defendant's offense level by 3 if "the victim is a minor and, in exchange for money or other consideration, was placed in the care or custody of another person who had no legal right to such care or custody of the victim." See id. at 122 (quoting § 2A4.1(b)(6)). The defendant in Alvarez-

- 22 -

<u>Cuevas</u> offered two reasons why that enhancement did not apply there:

> (1) the [kidnapped] child was never "placed in the care or custody of another person who had no legal right to such care or custody," because the enhancement refers to placing the victim in the custody of a third party, not one of the kidnappers; [and] (2) because [the two co-conspirators] who kept the child . . . were not paid money or other consideration to keep the child but rather merely expected to receive some of the proceeds of the ransom, the child was not placed in their custody "in exchange for money or other consideration."

<u>Id.</u> at 124. Agreeing with the defendants, <u>Alvarez-Cuevas</u> held that subpart (b)(6) applies only "where the child is kidnapped, by special order, to be turned over to the custody of a third party who has no custody rights and who has paid the kidnappers to do the job," as well as where "the ransom-demanding kidnapper, who in an effort to make it harder to find the [child], pays a third party to keep and care for the child." <u>Id.</u> at 122, 126-27. A contrary interpretation, <u>Alvarez-Cuevas</u> concluded, "would render the '*placed* in the custody of another person' a nullity" and would "create[] . . . incentive[s] for kidnappers to hide or even to abandon children (thus avoiding responsibility for their custody or care)." <u>Id.</u> at 127.

        <u>Reynolds</u> dropped a "<u>cf.</u>" citation to <u>Alvarez-Cuevas</u>, with the following parenthetical: "(construing § 2A4.1(b)(6) to apply only to situations involving third parties even though the section makes no explicit reference to them, because of additional

- 23 -

harm implicated in such situations)." 714 F.3d at 1044-45. But the "cf." signal is a dead giveaway that the Seventh Circuit believed Alvarez-Cuevas did not speak directly to subpart (b)(1). After all, and as the Supreme Court's cases make clear, "cf." is "an introductory signal which shows authority that supports the point in dictum or by analogy, *not one that 'controls' or 'dictates' the result*." Lambrix v. Singletary, 520 U.S. 518, 529 (1997) (emphasis added). And because Alvarez-Cuevas is not controlling precedent on the § 2A4.1(b)(1) issue, Romero's first attempt to clear the high plain-error hurdle falls short.

With no binding precedent on his side, Romero cannot succeed on plain-error review unless he shows his ransom-demand theory is compelled by the guidelines' language itself. See, e.g., Jones, 748 F.3d at 70; Caraballo-Rodriguez, 480 F.3d at 70. And to the extent he tries to make that argument, it fails too.

In Reynolds — the case he hangs his hat on — the Seventh Circuit candidly acknowledged how "difficult" the issue is, because the guidelines do not define "ransom" and the guidelines' commentary offers "no insight into what conduct the Sentencing Commission intends § 2A4.1(b)(1) to punish."[5] 714 F.3d at 1044.

---

[5] The Sentencing Commission is an agency tasked by Congress with issuing sentencing guidelines and keeping them current. See 28 U.S.C. § 994.

- 24 -

The Seventh Circuit also rejected the ransom definition in *Black's Law Dictionary* ("*Black's*," for short), see id. — which is the go-to dictionary for courts in figuring out the commonest legal meanings of terms, see generally United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001) (noting how the court was turning "predictably" to *Black's* "to glean the *most widely accepted* legal meaning" of the term at issue there (emphasis added)).  *Black's* defines "ransom" as "[m]oney or other consideration demanded or paid for the release of a captured person or property," which, the government in Reynolds argued, could include a demand made on the victim himself.  See 714 F.3d at 1044 (quoting *Black's*).  But the Seventh Circuit found that definition to be "overinclusive" because under it "even a simple mugging would include a 'ransom' demand if at some point during the attack" the attacker "offered to let the victim go in exchange for her valuables or some other benefit."  Id.

The Seventh Circuit then said that the "language of the guideline . . . *presupposes* the existence of a third party."  Id. (emphasis added).  Section 2A4.1(b)(1), the court noted, "applies if 'a ransom demand *or* a demand upon government was made.'"  Id. (quoting the provision).  These "are distinct actions," the court wrote, "and yet the Sentencing Commission . . . group[s] them together," even though "a 'demand upon government' cannot be made

- 25 -

during a kidnapping without the communication of demands to people other than those held captive." Id. And because "'a demand upon government' cannot be made during a kidnapping without the communication of demands to [non-captives]," the court said "that 'ransom demand' is fairly read to also include this third-party element." Id.

Moving on, the Seventh Circuit then discussed potential policy concerns;[6] noted potential parallels between the provision and the Hostage Taking Act ("HTA"), 18 U.S.C. § 1203;[7] and mentioned that while "no appellate court has considered whether § 2A4.1(b)(1) requires the communication of demands to third parties," it had "not found a single appellate decision where the adjustment had

---

[6] "[K]idnapping someone . . . to compel *others to* act, as a substitute for confronting or attempting to rob those others in person," the court stated, "can be a very effective way to accomplish crime that merits heightened deterrence." Id. But if this is done "without the knowledge of anyone except for the victim, the scope of the crime and risk of harm to others, while undoubtedly extensive, is nonetheless not as great." Id.

[7] "[T]he HTA," the court remarked, "punishes 'whoever . . . seizes or detains and threatens to kill, to injure, or to continue to detain another person . . . *to compel a third person or a governmental organization to do or abstain from doing any act* as an explicit or implicit condition for the release of the person detained.'" Id. at 1045 (quoting 18 U.S.C. § 1203(a)) (first alteration in original). And "[g]iven the[] similarities in language and parallel structure," the court added, "§ 2A4.1(b)(1) appears to paraphrase the language of the HTA," and so the court "believe[d] it is meant to apply only when a kidnapper issues demands . . . to compel a third party (either the government or private citizen) to act." Id.

been applied to a defendant who did not intend for his demands to reach a third party."[8]

That the Seventh Circuit judged the ransom-demand issue "difficult" — justifying resort to interpretative aids (including presupposition) — kiboshes any suggestion on Romero's part that the guidelines' words unquestionably support his position. Properly viewed, his ransom-demand argument ultimately "turns on judicial construction of the [guidelines]," and "since we have not yet adopted the construction he urges, there is no plain error." See Caraballo-Rodriguez, 480 F.3d at 73.

If more were needed (and it is not), the Eleventh Circuit, unlike the Seventh Circuit, accepts *Black's* definition in interpreting "ransom demand" in § 2A4.1(b)(1) — specifically, the Eleventh Circuit has held that "[n]othing in that definition excludes" money that the kidnapper thinks the victim owes him from qualifying as a "ransom demand." See United States v. Digiorgio, 193 F.3d 1175, 1178 (11th Cir. 1999) (per curiam). And the Fifth and Second Circuits have upheld enhancements under § 2A4.1(b)(1) where the kidnappers demanded money or other consideration from the victim and not a third party. See United States v. Andrews, 503 F. App'x 257, 258 (5th Cir. 2012) (per curiam); United States

---

[8] Id. (footnote omitted).

v. Escobar-Posado, 112 F.3d 82, 82-83 (2d Cir. 1997) (per curiam).

In a later case, the Second Circuit specifically observed that its

Escobar-Posado opinion "took a different approach" to the ransom-

demand guideline than the Seventh Circuit's Reynolds opinion.  See

United States v. Cole, 594 F. App'x 35, 38 (2d Cir. 2015) (summary

order).  Anyhow, the different precedents on the question at hand

preclude Romero from showing that any error (if error there was)

was plain — which is to say, clear or obvious.[9]  See, e.g., United

States v. D'Amario, 412 F.3d 253, 256–57 (1st Cir. 2005); United

States v. Diaz, 285 F.3d 92, 97 (1st Cir. 2002).

The bottom line:  Perhaps someday we will have to take

a definitive stand on the ransom-demand issue.  Cf. generally

Caraballo-Rodriguez, 480 F.3d at 70 (noting that a holding that a

party "has not met his burden of showing there was an error which

was plain" is not a "ruling on the merits").  But for today's

purposes, it suffices to say that Romero's ransom-demand theory is

not the stuff of plain error.  See generally United States v.

Frady, 456 U.S. 152, 163 (1982) (noting that plain error assumes

---

[9] To the extent Romero believes the government did not make —
and thus waived — any argument on the "clear or obvious" prong, he
is dead wrong, as the government believes Reynolds's holding does
not help Romero demonstrate "a 'clear or obvious' error" on the
judge's part.

an error so self-evident that the judge should have avoided it, "even absent the defendant's timely assistance in detecting it").

*Obstruction of Justice and Minor Role*

Romero knocks the judge for not "expressly" ruling on his objections to the PSR's inclusion of a 2-level obstruction-of-justice enhancement and rejection of a 2-level minor-role reduction. And he criticizes the judge for not properly calculating the sentencing range because (the theory goes) the record did not support the enhancement but did support the reduction. Agreeing with Romero that the judge did not explicitly rule on his two targeted objections, the government counters that his protests "were inconsequential to the proper calculation" of the sentencing range. The government also argues that the record "amply support[s]" the judge's denial of his objections. For our part, regardless of the applicable standard of review — the government sometimes talks about plain error, and Romero talks about abuse of discretion — we see no need for a sentencing do-over.

Take Romero's first beef. We agree with the parties that the judge did not expressly rule on his objections at sentencing (though the judge arguably addressed Romero's minor-role-reduction request at sentencing when he said he "agree[ed] with the government's characterization that . . . Romero's role

- 29 -

was very important in the organization").  But that gets Romero only so far.

Sentencers, of course, "must — for any disputed portion of the [PSR] or other controverted matter — rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because [they] will not consider the matter in sentencing."  Fed. R. Crim. P. 32(i)(3)(B).  Our preference is for judges to make reasonably explicit rulings on properly disputed matters.  See, e.g., United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996).  But the lack of an explicit ruling is not always catastrophic.  United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017).  Our case law allows us to uphold sentencing conclusions if the judges "*implicitly* resolved" the disputes, like when their "statements and the sentence[s] imposed show[] that the [disputes] were decided in a particular way."  Van, 87 F.3d at 3 (emphasis added); see also United States v. Zehrung, 714 F.3d 628, 632 (1st Cir. 2013).

Returning to our case, we see that the judge started the sentencing hearing by saying that he read the PSR and the parties' sentencing memos.  Which means he knew that (a) the PSR recommended a sentencing range of 360 months to life, a range driven in part by a rejection of Romero's obstruction-of-justice/minor-role-based objections; that (b) Romero wanted a 120-month sentence; and that

- 30 -

(c) the government wanted a 312-month sentence. Saying he was "not sure" if Romero's objections mattered — because, as he saw it, the government's asked-for sentence was "below" what Romero would get if he resolved the objections in Romero's favor — the judge then had the lawyers flesh out their "approach to the case" and their "recommendation." So the lawyers talked a lot to the judge about Romero's role in the conspiracy and whether he had obstructed justice. Ultimately, however, in selecting a 276-month sentence (a term even lower than the below-guidelines sentence the government recommended), the judge adopted the PSR (emphasis ours) "*without* change" — *i.e.*, he accepted the PSR's sentencing-range calculations, including its rejection of Romero's obstruction-of-justice/minor-role-based protests. This we know because of the judge's written statement of reasons. So the record read as a whole "reliably shows" that the judge implicitly resolved Romero's objections against him. See Carbajal-Váldez, 874 F.3d at 783-84. Which suffices to reject his no-express-ruling argument. See id.; see also United States v. Zayas-Ortiz, 808 F.3d 520, 523-24 (1st Cir. 2015) (rejecting a defendant's claim that the lower court did not "give sufficient reasons for its decision" denying his sentence-reduction motion, our rationale being that the court had checked a box on a form indicating it had considered the appropriate policy statements and sentencing factors, and we could

infer the denial's basis by comparing what the parties argued with what the court did).

As for Romero's second argument — that the record does not back the obstruction-of-justice increase but does back the minor-role decrease — even less need be said. With a total-offense level of 42 and a criminal-history category of VI, Romero had a sentencing range of 360 months to life. Granting him a 2-level minor-role reduction and jettisoning the 2-level obstruction-of-justice enhancement would drop his total-offense level to 38 (a number that includes the ransom-demand enhancement, which, as we said, survives plain-error review). Combined with the same VI criminal-history category, Romero's sentencing range would remain 360 months to life. See USSG Ch. 5, Pt. A (sentencing table). Thus any error (if there was one) in resolving Romero's objections against him provides no basis for upsetting the sentence. See United States v. Hinkley, 803 F.3d 85, 93-94 (1st Cir. 2015) (finding no reason to vacate a defendant's sentence because even if the contested "enhancement were removed, the guideline sentence would be unchanged" — which means "any error in the application of this enhancement was harmless"); see also United States v. Monteiro, 871 F.3d 99, 115 n.15 (1st Cir. 2017) (declining to consider an argument about an enhancement because fixing any error would not change defendant's sentence), cert. denied, 2018 WL

1278424 (2018); cf. United States v. Sepulveda, 15 F.3d 1161, 1199 (1st Cir. 1993) (stating that "[i]t is unnecessary to address an allegedly erroneous sentencing computation if, and to the extent that, correcting it will not change the applicable offense level or otherwise influence the defendant's" sentencing range and (thus) his sentence); United States v. Carrozza, 4 F.3d 70, 88 (1st Cir. 1993) (explaining that courts have "inherent power not to decide disputes that are immaterial or irrelevant to the ultimate sentence").

Enough said about Romero's procedural-reasonableness challenge. On then to his substantive-reasonableness challenge.

## Substantive Reasonableness

Romero separately argues that his 276-month sentence is substantively unreasonable (or too long, in everyday speech) — a multifaceted claim based on his belief that the judge, first, wrongly hit him with an obstruction-of-justice increase and unfairly withheld a minor-role decrease, and, second, "unjustifiably" picked a term "more severe than those of more culpable defendants in the instant case and than those sentences imposed nationally at the median for this offense." Reviewing his claim for abuse of discretion, see Tanco-Pizarro, 892 F.3d at 483, we detect none.

- 33 -

Romero's argument about the obstruction-of-justice and minor-role adjustments is simply a repackaged version of the one just rejected. And it fails for reasons already given.

Romero's next contention — that the 276-month sentence created an unwarranted sentencing disparity between himself and his codefendants — is not without some surface appeal. But it cannot be sustained.

Sentencers, no doubt, must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The key word is "unwarranted" — that is, § 3553(a)(6) does not ban all disparities, just "unwarranted" ones. Anyway, the statute's main concern is minimizing "national[]" sentencing disparities among like criminals who commit like crimes. See United States v. Martin, 520 F.3d 87, 94 (1st Cir. 2008). Even so, our cases recognize that "legitimate concerns may arise" if a judge sentences "similarly situated coconspirators or codefendants" to "inexplicably disparate" terms. See United States v. Demers, 842 F.3d 8, 15 (1st Cir. 2016); see also United States v. Correa-Osorio, 784 F.3d 11, 28 n.25 (1st Cir. 2015). But — and it is a big "but" — our cases also recognize that such a disparity claim will flop "if material differences between the defendant and the proposed comparator[s] suffice to

- 34 -

explain the divergence." <u>Demers</u>, 842 F.3d at 15. And by material differences our cases mean things like dissimilar criminal involvement, criminal histories, or cooperation with the government, to name just a few. <u>See</u> <u>United States</u> v. <u>Flores-Machicote</u>, 706 F.3d 16, 24 (1st Cir. 2013).

Yes, Guzman, Maldonado, Wallace, Reynoso, and Matos all received sentences considerably less than 276 months. But unlike Guzman, Maldonado, Wallace, and Reynoso, Romero did not cooperate with the government. And unlike Matos, Romero abducted Amparo and Castro at gunpoint.[10] These differences make the sentencing disparities reasonable.[11] <u>See, e.g.</u>, <u>United States</u> v. <u>Mueffelman</u>, 470 F.3d 33, 41 (1st Cir. 2006) (discussing cooperation); <u>United States</u> v. <u>Reverol-Rivera</u>, 778 F.3d 363, 366 (1st Cir. 2015)

---

[10] Citing a statement in the PSR that Matos was "part of the team that kidnapped [the victims] on July 23, 2012," Romero asserts that the evidence concerning Matos's role is "unclear at best." But despite his best efforts, we see nothing inconsistent between that statement and descriptions later in the PSR suggesting that Matos's role as part of that team was limited to attaching a GPS device and storing uniforms and weapons.

[11] Romero concedes, as he must, that a sentencing difference is not a forbidden disparity if justified by a legitimate consideration, like rewarding cooperation. But he thinks this principle does not apply here because, in his words, prosecutors opted to let "defendants who were among the most culpable to cooperate against lower members of the organization." Romero rests his theory on pure speculation, not case analysis. And so we say no more about it. <u>See</u> <u>Muñiz</u> v. <u>Rovira</u>, 373 F.3d 1, 8 (1st Cir. 2004) (holding waived a skeletal argument unaccompanied by "citation to any pertinent authority"); <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (same).

(discussing culpability). Also hurting Romero is his failure to present info about his co-conspirators' criminal histories, info we need so we can see if "he and his proposed comparators are similarly situated." See United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir.), cert. denied, 138 S. Ct. 163 (2017).

Trying to avoid the inevitable result of this reasoning, Romero argues that any dissimilarities between him and his co-conspirators should not matter, thanks to United States v. Reyes-Santiago, 804 F.3d 453 (1st Cir. 2015). But Reyes-Santiago is easily distinguishable from our own case. Reyes-Santiago's sentence reflected an unwarranted disparity for two reasons. First, the district court did not accept his drug-amount stipulation but did accept his co-defendants', without offering any rationale to "justif[y] the uniquely harsh approach" in picking his sentence." Id. at 468-73; see generally United States v. Ramos Diaz, 702 F. App'x 1, 3 n.3 (1st Cir. 2017) (explaining that Reyes-Santiago "involved a Sentencing Guidelines factor — drug quantity — that was applicable to all of the defendants and was applied uniquely harshly to the appellant"). And second, the district court considered info that Reyes-Santiago had participated in a "massacre" after saying it would "not . . . factor the murders into the defendants' sentences for the drug conspiracy." Reyes-

- 36 -

<u>Santiago</u>, 804 F.3d at 473.  Nothing like that happened here, however.

That leaves us with Romero's suggestion of a disparity between his sentence and the sentences of similarly situated defendants across the country.  The problem for him is that he floats this suggestion in the "Summary of Argument" section of his brief and then never gives it the sort of treatment needed to preserve the point for appellate review.  For instance, he does not give us the necessary info about the other defendants — their criminal involvement, their criminal histories, their cooperation (or not) with the government, *etc.* — to do an "apples to apples" comparison.  See <u>Rodríguez-Adorno</u>, 852 F.3d at 177 (emphasizing that "[a] credible claim of sentencing disparity requires that the proponent furnish . . . enough relevant information" so that "the court [can] compare apples to apples" (internal quotation marks omitted)).  So we deem the suggestion waived by perfunctory treatment.  See <u>United States</u> v. <u>Pérez</u>, 819 F.3d 541, 547 (1st Cir. 2016); <u>United States</u> v. <u>Pérez-Mejílas</u>, 292 F. App'x 69, 70 (1st Cir. 2008).

**WRAP UP**

Having worked our way through the issues, we *affirm* Romero's sentence.