# United States Court of Appeals
## For the First Circuit

No. 21-1198

UNITED STATES OF AMERICA,

Appellee,

v.

CARLOS SOTO-VILLAR, a/k/a Jairo,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Kayatta, Selya, and Gelpí,
Circuit Judges.

Thomas J. Gleason and Gleason Law Offices, P.C. on brief for appellant.
Rachael S. Rollins, United States Attorney, and Mark T. Quinlivan, Assistant United States Attorney, on brief for appellee.

July 11, 2022

**SELYA**, **Circuit Judge**.     In this sentencing appeal, defendant-appellant Carlos Soto-Villar claims that his 188-month sentence rests, in part, on two errors:  the district court's allegedly misguided attribution to him of all drugs found in an apartment used by him and his coconspirators, and the district court's allegedly erroneous application of the so-called "stash house" enhancement.  Concluding, as we do, that these claims do not survive scrutiny, we affirm.

## I

We briefly rehearse the relevant facts and travel of the case.  Throughout the latter part of 2018, the defendant and a coconspirator, Angel Valdez, ran a drug-trafficking enterprise in and around Methuen, Massachusetts.  Valdez lined up shipments of heroin and fentanyl from Mexican suppliers and recruited the defendant to join him because of the defendant's local drug distribution network.

Together, they stored the drugs that Valdez procured in a third-floor apartment at 73 Tenney Street in Methuen.  The apartment was leased by the defendant and the defendant's girlfriend, using aliases.  The apartment was, for the most part, unfurnished, but it was equipped with various drug paraphernalia for weighing, cutting, and packaging drugs.  Before selling the drugs, the two coconspirators prepared, cut, weighed, and packaged them inside the apartment.

The record is murky on the issue of habitation, although there is evidence indicating that the defendant slept in the apartment (at least on some occasions). The district court made no finding as to whether he actually lived there.

The defendant developed a working relationship with Ana Caraballo (who had previously dated Valdez). Caraballo began brokering drug deals for the defendant in the fall of 2018. In late November, the defendant informed Caraballo of a recent shipment of drugs (approximately ten kilograms of fentanyl) that were ready to sell. Caraballo contacted Luis Cabrera, who had said that he wanted to buy two kilograms of fentanyl. Unbeknownst to Cabrera or to Caraballo, Cabrera's putative purchaser was working with the Drug Enforcement Administration (DEA) as a confidential source. The defendant agreed to sell Cabrera a kilogram of fentanyl for $52,000.

On December 6, Caraballo collected the kilogram from the defendant at the Tenney Street apartment. The next day, she transferred the drugs to Cabrera and drove with him to rendezvous with the putative purchaser. While they were en route to a secondary location, state troopers stopped their vehicle, arrested the pair, and seized the fentanyl.

Caraballo eventually admitted that she had secured the drugs from the Tenney Street apartment. Armed with this

information, DEA agents applied for a search warrant. In the meantime, the apartment was placed under surveillance.

Once the search warrant was obtained, state troopers approached the apartment and announced their presence. At that point, three men fled from inside the apartment. These men were later identified as the defendant, Valdez, and Felix Vanoy Pineda-Lara. Valdez and Pineda-Lara avoided apprehension that night, but the defendant was nabbed a short distance from the apartment.

In the ensuing search of the apartment, DEA agents seized a substantial quantity of drugs,[1] along with extensive evidence that drugs were being stored, cut, weighed, and packaged there. For example, the agents seized three blenders (used to mix drugs with adulterants), a quantity of lactose (a cutting agent), two digital scales, three steel drug presses, drug-packaging materials, a vacuum sealer, and a spiral notebook consistent with a drug ledger. What is more, the agents seized $15,500 in cash.

In due course, a federal grand jury sitting in the District of Massachusetts returned an indictment, which (as relevant here) charged the defendant with conspiracy to distribute and to possess with intent to distribute 400 grams or more of

---

[1] The seized drugs included 8,971.341 grams of fentanyl (including 1,815 grams of a mixture containing fentanyl and heroin), and 188.5 grams of heroin. This contraband was estimated to have a street value of roughly $500,000.

- 4 -

fentanyl.[2]  See 21 U.S.C. § 846.  On May 26, 2020, a grand jury returned a superseding indictment charging the defendant and Valdez with a single count of conspiracy to distribute and to possess with intent to distribute one kilogram or more of heroin and 400 grams or more of fentanyl.  See id.  Valdez and the defendant were tried separately.  Following a four-day trial and two days of deliberation, a jury found the defendant guilty.  As part of the verdict, the jury determined that one kilogram or more of heroin and 400 grams or more of fentanyl were reasonably foreseeable by and attributable to him.[3]

For federal sentencing purposes, drug quantity plays a key role in establishing a drug-trafficking defendant's base offense level (BOL).  See United States v. Ventura, 353 F.3d 84, 87 (1st Cir. 2003).  Drugs are attributed to a defendant both from the count(s) of conviction and from "'relevant' uncharged conduct."  United States v. Bradley, 917 F.2d 601, 604 (1st Cir. 1990) (quoting USSG §1B1.3(a)(3)).  Put another way, drug quantities not included in the count(s) of conviction may still be attributed to the defendant if they were "bound up in the acts 'that were part of the same course of conduct or common scheme or

---

[2] The same indictment contained charges against Caraballo and Cabrera.

[3] Based on the drug quantities found by the jury, the defendant faced a mandatory minimum sentence of ten years to life.  See 21 U.S.C. §§ 841(b)(1)(A)(vi), 846.

- 5 -

plan as the offense of conviction.'" United States v. Sepulveda, 15 F.3d 1161, 1197 (1st Cir. 1993) (quoting USSG §1B1.3(a)(2)).

In the case of jointly undertaken criminal activity, such as a conspiracy, a defendant is "not automatically saddled with the full weight of the conspiracy's wrongdoing." Id. Even so, he may be held responsible for drugs "bound up" in others' acts that were reasonably foreseeable by him so long as those acts were committed within the scope of the conspiracy and in furtherance of it. Id.; see United States v. Garcia, 954 F.2d 12, 15-16 (1st Cir. 1992); see also USSG §1B1.3(a)(1)(B).

To bring uncharged acts and drug quantities into play at sentencing, the government must establish an adequate connection between the conduct and the offense(s) of conviction. See United States v. Sklar, 920 F.2d 107, 110 (1st Cir. 1990). And it must prove all drug quantities, including those reasonably foreseeable within a conspiracy, by a preponderance of the evidence. See id.; Sepulveda, 15 F.3d at 1198. The defendant's role in the conspiracy is, of course, an important datum in establishing his responsibility for uncharged conduct. See Garcia, 954 F.2d at 16.

Once a defendant's BOL is determined, the court may make various adjustments, both up and down, consistent with the sentencing guidelines. The objective is to determine the defendant's total offense level (TOL), which — when combined with his criminal history category (CHC) — yields his advisory guideline

sentencing range (GSR).  See United States v. Platte, 577 F.3d 387, 390 (1st Cir. 2009); see also USSG Ch.5, Pt.A (Sentencing Table).

With this backdrop in place, we return to the case at hand.  Following the jury's verdict, the district court ordered the preparation of a presentence investigation report (PSI Report).  Among other things, the probation department's investigation teased out a connection between the defendant and an earlier incident.  In November of 2018, the defendant and Valdez allegedly sent Pineda-Lara to retrieve fifteen kilograms of fentanyl from a truck driver in Sturbridge, Massachusetts.  When the authorities attempted to thwart the transaction, Pineda-Lara abandoned his vehicle, discarded the bag of drugs, and avoided apprehension by fleeing on foot.  The authorities recovered the fifteen kilograms of fentanyl from the roadside.

The district court convened the disposition hearing on March 4, 2021.  Early on, the court turned its attention to determining the GSR.  In the process, the court relied heavily on recommendations contained in the PSI Report.

The PSI Report recommended that the defendant be held responsible for 62,965.55 kilograms of converted drug weight.[4]

---

[4] When only one drug is considered at sentencing, the actual weight involved establishes the BOL.  When — as in this case — more than one drug is involved, the quantity of each drug is multiplied by a conversion factor to yield "converted drug weight,"

This drug weight was predicated on the kilogram of fentanyl that the defendant delivered to Caraballo, the nine-kilogram assortment of heroin and fentanyl seized at the Tenney Street apartment, and the fifteen kilograms of fentanyl recovered from the uncharged transaction between Pineda-Lara and the truck driver. The upshot was a BOL of 36. See USSG §2D1.1(c)(2) (explaining that "[a]t least 30,000 KG but less than 90,000 KG of Converted Drug Weight" results in BOL of 36).

The PSI Report also recommended a two-level "stash house" enhancement, concluding that the defendant maintained the Tenney Street apartment as a premises for the purpose of distributing a controlled substance. See id. §2D1.1(b)(12). With this enhancement in place, the defendant's TOL of 38 and his CHC of I called for a GSR of 235 to 293 months in prison. See USSG Ch.5, Pt.A (Sentencing Table).

The defendant objected to the proposed drug quantity and to the "stash house" enhancement. The government defended the probation department's recommendations on both fronts. After considering the parties' views, the district court concluded that the fifteen kilograms of fentanyl tied to Pineda-Lara could not fairly be attributed to the defendant. The court further concluded

---

so that quantities of different drugs may be combined into a single number for purpose of establishing the BOL and — ultimately — calculating the GSR. See USSG §2D1.1(c), n.(K).

- 8 -

that the kilogram of fentanyl distributed to Caraballo and all the drugs found inside the Tenney Street apartment were reasonably foreseeable by the defendant and, thus, fairly attributable to him. The court premised its inclusion of the drugs in the apartment on a series of subsidiary findings: that the defendant rented the apartment; that he was "deeply involved" in the conspiracy, which utilized the apartment as a base of operations for its drug-distribution activities; and that he used it for storing, cutting, weighing, and packaging drugs.

The district court's findings triggered a revised BOL of 34. See id. §2D1.1(c)(3). The court then turned to the two-level "stash house" enhancement, see id. §2D1.1(b)(12), and upheld it. In this regard, the court stressed that the defendant was "firmly placed" in the apartment — which he leased — "beyond any doubt." The court emphasized the defendant's role in packaging the drugs and dealing with Caraballo.

With a TOL of 36 and a CHC of I, the defendant's GSR was 188 to 235 months. See USSG Ch.5, Pt.A (Sentencing Table). After hearing the arguments of counsel and the defendant's allocution, the court imposed a bottom-of-the-range sentence: a 188-month term of immurement. This timely appeal ensued.

## II

On appeal, the defendant advances two interrelated claims of error. First, he asserts that the district court erred

when it attributed to him the totality of the drugs found in the Tenney Street apartment. Second, he asserts that the district court erred when it applied the "stash house" enhancement.[5]

Each of these claims was seasonably raised in the district court and, thus, each of them is duly preserved for appeal. See Platte, 577 F.3d at 391.

**A**

Preserved claims of sentencing error are reviewed for abuse of discretion. See Gall v. United States, 552 U.S. 38, 41 (2007); United States v. Cortés-Medina, 819 F.3d 566, 569 (1st Cir. 2016). Abuse of discretion is not a monolithic standard of review. See United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015); United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). Under this rubric, "we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, assay the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion." Ruiz-Huertas, 792 F.3d at 226.

In this case, the defendant's chief claim of error is focused on the district court's subsidiary drug-attribution

---

[5] This claim of error is presented in a desultory fashion and without much clarity. Accordingly, it might well be deemed waived for lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). We nonetheless give the defendant the benefit of the doubt and address the claim head-on.

findings. Such findings are factual findings and, thus, are reviewed for clear error. See United States v. Huddleston, 194 F.3d 214, 223 (1st Cir. 1999). Similarly, the defendant's objection to the use of the "stash house" enhancement constitutes a factbound challenge and, thus, is reviewed for clear error. See United States v. Jones, 778 F.3d 375, 383 (1st Cir. 2015). Under this deferential standard, we must accept the district court's findings unless, on the whole of the record, we form "a strong, unyielding belief that a mistake has been made." United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010) (quoting Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990)).

**B**

The defendant's chief claim of error challenges the district court's attribution to him of the drugs found in the apartment. He asserts that he did not rent the apartment, pointing to what he says is an obvious dissimilarity between the signature on the lease and the signature on his driver's license. He adds that he was not a major player in the conspiracy but, rather, merely a mid-level dealer. Finally, he notes the paucity of surveillance data pinning him to the apartment.

Where, as here, a drug quantity finding is used to develop a defendant's guideline range, the government has the burden of proving the drug quantity by a preponderance of the

evidence.  <u>Sepulveda</u>, 15 F.3d at 1198.  The record in this case amply supports the sentencing court's drug-quantity finding.

To begin, the court carefully canvassed the record and supportably determined that the defendant rented the Tenney Street apartment.  Similarly, the court supportably determined that the defendant was "deeply involved" in the conspiracy.  We briefly discuss the basis for each of these subsidiary findings.

As a formal matter, the apartment was leased to "Emilio Rivera."  The record shows with conspicuous clarity, though, that "Emilio Rivera" was a pseudonym used by the defendant.  Indeed, it was the name that he gave to the authorities when he was apprehended and the name that appeared on the driver's license that he carried on his person.  Moreover, the co-tenant shown on the lease was the defendant's girlfriend (also using an alias). These facts provided a firm foundation for the district court's findings that "Emilio Rivera" and the defendant were one and the same and that the defendant — not an imposter — had rented the apartment.

There was more.  The record makes manifest that the defendant — along with Valdez — used the apartment to store, cut, weigh, and package large quantities of drugs to sell to the conspiracy's customers.  Caraballo visited the apartment on several occasions and regularly saw the defendant there, among "kilos" of drugs and drug paraphernalia for preparing, packaging,

- 12 -

and distributing. She further testified that, on one occasion, she purchased a large number of Ziplock bags at the defendant's request and delivered them to the defendant at the apartment. Similar bags, used for packaging drugs, were discovered at the apartment during the search. In addition, the defendant fled from the apartment on the night of his arrest and was found to be carrying a cell phone containing images of drugs and drug paraphernalia closely resembling those within the apartment.

The district court's factbound finding that the defendant was "deeply involved" in the conspiracy is ironclad. Importantly, the record reveals that the defendant was recruited into the conspiracy because he had assembled a local sales network. The evidence is compelling that — as the district court found — the drugs within the apartment were to be sold in the ordinary course of the conspiracy's operations through the defendant's network. Given this evidence, the record permits a reasonable inference that he was a critical cog in the machinery of the conspiracy. After all, Caraballo testified that Valdez recruited the defendant for the operation because he would be able to "move" — that is, sell — the drugs more quickly, knowing more people in the area. Typically, the person who is leading the sales effort is as essential to the success of a business as the person who is leading the procurement effort.

A finding of attribution requires an individualized determination of drug quantity, even when taking a conspiracy-wide perspective. See United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004). This determination must be based on amounts reasonably foreseeable by the defendant, contemplated within the scope and in furtherance of the conspiracy. See id. In making such a finding, a sentencing court is entitled to draw reasonable inferences from the facts before it. See Cintrón-Echautegui, 604 F.3d at 6-7. Here — in light of the totality of the circumstances — it strains credulity to argue that the district court misperceived the record in attributing the drugs inside the apartment to the defendant. Far from producing "a strong, unyielding belief that a mistake has been made," id. at 6, the record validates the district court's drug-attribution determination. It follows that nothing resembling clear error infects that determination.

The defendant resists this conclusion. He complains that he cannot be held responsible for the drugs in the apartment because he was neither the ringleader of the conspiracy (Valdez, he says, was the boss) nor the importer of the contraband. But labels are not dispositive with respect to drug-quantity attribution. See United States v. Mateo-Espejo, 426 F.3d 508, 512 (1st Cir. 2005) (noting that "courier" handled and, thus, was still responsible for large drug quantity); United States v. Santos, 357

F.3d 136, 141 (1st Cir. 2004) (similar). The proper inquiry remains whether the defendant — a person "deeply involved" in the conspiracy — reasonably could foresee that the drugs inside the apartment were to be distributed in the ordinary course of the conspiracy's operations. See USSG §1B1.3(a)(1), comment. (n.1); see also Santos, 357 F.3d at 140; Colón-Solís, 354 F.3d at 103. On this record, we discern no clear error in the district court's affirmative response to that inquiry. After all, even though Valdez may have procured the drugs and assembled the inventory, it was the defendant who spearheaded their distribution.

The defendant has one last shot in his sling. He argues that because the authorities had not previously surveilled the apartment to develop what he terms "historical evidence" about the conspiracy, the drugs found there cannot be attributed to him. This is whistling past the graveyard: surveillance evidence may prove helpful in making a drug-attribution finding, but such evidence is not a sine qua non for such a finding. See Cintrón-Echautegui, 604 F.3d at 6 (noting that district courts may generally rely upon information contained in PSI Report); Sklar, 920 F.2d at 110 (noting that sentencing court may rely on "virtually any dependable information" to calculate drug quantity). The question is not what historical evidence would have revealed but, rather, whether the evidence presented was sufficient to show that the defendant bore responsibility for the

drugs in the apartment.  See Cintrón-Echautegui, 604 F.3d at 7;

Ventura, 353 F.3d at 87-88; see also United States v. Tardiff, 969

F.2d 1283, 1287 (1st Cir. 1992) (explaining that sentencing court

has "broad discretion to determine what data is, or is not,

sufficiently dependable to be used in imposing sentence").  The

government surpassed that benchmark here.

## C

This brings us to the two-level "stash house"

enhancement.  We assume, favorably to the defendant, that his

challenge to this enhancement has been adequately developed.  See

supra note 5.

The "stash house" enhancement provides in relevant part

that "[i]f the defendant maintained a premises for the purpose of

manufacturing or distributing a controlled substance," the

sentencing court may increase his offense level by two levels.

The government bears the burden of proving the applicability of

sentencing enhancements by a preponderance of the evidence.  See

Jones, 778 F.3d at 383; United States v. Paneto, 661 F.3d 709, 715

(1st Cir. 2011).  An application note to the sentencing guidelines

explains that:

> Subsection (b)(12) applies to a defendant who
> knowingly maintains a premises (*i.e.*, a
> building, room, or enclosure) for the purpose
> of manufacturing or distributing a controlled
> substance, including storage of a controlled
> substance for the purpose of distribution.

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (*e.g.,* owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.
>
> Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

USSG §2D1.1, comment. (n.17).

The application note fits this case like a glove, and the record unquestionably substantiates the district court's application of the enhancement. As we already have explained, the court supportably found that the defendant rented the apartment. Therefore, he had a possessory interest in it. Then the defendant — in concert with Valdez — proceeded to use the apartment as the nerve center of the conspiracy's operations. That usage was continuous: drugs were regularly stored, cut, weighed, and packaged there. The equipment and supplies needed to perform those tasks were kept on the premises. Thus, the defendant exercised dominion and control over both the apartment and the drugs. To summarize succinctly, the defendant knowingly maintained the

apartment as a premises for the packaging and distribution of drugs; that activity constituted a principal use of the apartment; and the defendant had a significant degree of control over the drug-related activities.

That ends this aspect of the matter. We review the district court's application of the enhancement only for clear error. See Jones, 778 F.3d at 383. Given the copious evidence in the record and the reasonable inferences therefrom, we discern none. See, e.g., United States v. Flores-Olague, 717 F.3d 526, 533 (7th Cir. 2013); United States v. Miller, 698 F.3d 699, 706-07 (8th Cir. 2012); United States v. Verners, 53 F.3d 291, 295-96 (10th Cir. 1995). And even if "the raw facts are susceptible to more than one reasonable inference" — and we doubt that they are — "a sentencing court's choice between those competing inferences cannot be clearly erroneous." Jones, 778 F.3d at 383. We conclude that the "stash house" enhancement was appropriately deployed.

**III**

We need go no further. For the reasons elucidated above, the defendant's sentence is


**Affirmed**.