# United States Court of Appeals
## For the First Circuit

No. 22-1276

UNITED STATES OF AMERICA,

Appellee,

v.

AMANDA FORD,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Montecalvo and Thompson, Circuit Judges,
and Carreño-Coll,* District Judge.

Syrie D. Fried, with whom Good, Schneider, Cormier, and Fried
was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

July 12, 2023

---

* Of the District of Puerto Rico, sitting by designation.

**CARREÑO-COLL, District Judge.** In this sentencing appeal, Amanda Ford faults the district court for failing to rule on her factual disputes and attributing to her a cache of fentanyl found in her boyfriend's home. Seeing no error as to the former and no clear error as to the latter, we affirm.

## I.

Because Ford pleaded guilty, we draw the facts from the change-of-plea colloquy, undisputed portions of the presentence investigation report ("PSR"), and sentencing hearing. See United States v. Rivera, 51 F.4th 47, 49 (1st Cir. 2022). Pedro Báez ran a drug-trafficking organization with the help of his son and his girlfriend, Ford. Tipped off, law enforcement officers wiretapped the organization's phones and set up controlled purchases. Two of them involved Ford. During the first controlled purchase, she delivered 2.5 grams of a heroin-fentanyl mixture to a cooperating witness who had contacted her at Báez's direction. During the second, she drove Báez's son to a meeting place where he delivered 6.3 grams of crack cocaine and 5.1 grams of fentanyl to a cooperating witness. The exchange took place in the car she was driving. In between these purchases, she told a customer who wanted to buy drugs to contact Báez's son.

Ford also kept an eye out for police around Báez's home. The government said in its sentencing memo that it had recorded calls showing that Ford would contact Báez when she noticed

something suspicious. On one call, she warned him that she had seen an unusual car. On another, she told him that she was listening to a police scanner because state troopers had gone by his home with a drug-sniffing dog. There was also a call, the government said, indicating that Ford was involved in large-scale transactions: Báez told his son that Ford was going to get $18,000 to pay another coconspirator for 500 grams of cocaine. Finally, the government argued that there were recorded calls showing that Ford and Báez shared customers. One of Báez's customers, for example, told him that he had tried calling Ford. And three days before Ford and Báez were arrested, Báez told a customer that Ford would deliver to him crack cocaine and a heroin-fentanyl mixture.

Law enforcement officers arrested Ford and Báez early in the morning at his home. They found 144.3 grams of a heroin-fentanyl mixture in his bedroom and another 1.35 grams inside a purse in a bedroom that she used.

A grand jury charged Ford, and others, with offenses stemming from Báez's drug-trafficking organization. She entered a straight guilty plea to Count One of the Superseding Indictment, which charged her with conspiring to distribute and possess with intent to distribute 1 kilogram or more of heroin, 280 grams or more of cocaine base, 400 grams or more of fentanyl, and 500 grams or more of cocaine. She agreed with the government's recitation of what it would have proved at trial, except its statement that

she could be held responsible for the cache of drugs found in Báez's home.

Adding together the drugs from the two controlled purchases and the 145.65 grams of fentanyl[1] found in Báez's home, the PSR set Ford's base-offense level at 26, see USSG § 2D1.1(c)(7), and subtracted 3 levels for acceptance of responsibility, see USSG § 3E1.1(a)-(b), for a total-offense level of 23. With a criminal history category of I and total-offense level of 23, her Guidelines sentencing range was 46 to 57 months of imprisonment. Ford objected to the PSR on several grounds, including to its attribution to her of the 145.65 grams of fentanyl found at the time of her arrest. The probation officer rejected her objections in writing.

The parties' arguments at sentencing will make more sense if we pause to explain why the PSR attributed to Ford the cache of fentanyl found in Báez's home. In a drug conspiracy, each coconspirator can be held responsible not only for the drugs that she personally handled but also for the drugs that others handled, so long as those acts were reasonably foreseeable to her, committed within the scope of the conspiracy, and in furtherance of the conspiracy. United States v. Soto-Villar, 40 F.4th 27, 31

---

[1] Although the drugs found in Báez's home were a mixture of heroin and fentanyl, they count as fentanyl for sentencing purposes because fentanyl results in the greater offense level. See USSG § 2D1.1(c), Note A to Drug Quantity Table.

- 4 -

(1st Cir. 2022); see also USSG § 1B1.3(a)(1)(B). With that in mind, we turn to Ford's sentencing.

At sentencing, the judge said that he had read the PSR, the parties' sentencing memos, and Ford's letters of support. He then noted that the PSR set Ford's Guidelines sentencing range at 46 to 57 months of imprisonment. Ford reiterated her objection to the PSR attributing to her the cache of fentanyl found in Báez's home -- without it, her base-offense level would be much lower. Although she was Báez's girlfriend and sometimes stayed the night at his home, she said that the PSR was incorrect to say that she lived there. And so there is no factual basis to attribute the cache to her, she argued, because her relationship with Báez standing alone was not enough to make those drugs reasonably foreseeable to her. She then raised what she called a "procedural" objection to the non-PSR information in the government's sentencing memo about "other transactions or other incidents that [the government] says . . . [she] was aware of or participated in." She contended that the court should ignore that information because it was not in the PSR and she had only a day's notice to investigate it. She nonetheless contested one of the calls not mentioned in the PSR: The government, she said, misrepresented what had happened on the call where Báez told his son about her role in getting the money to pay a coconspirator for a half kilogram of cocaine. She said that Báez had told his son that she

was going to wake up someone who would get the money, not that she would get the money herself.

The government responded that Ford had received in discovery about 2.5 years earlier the non-PSR information in its sentencing memo. It then defended the probation officer's rationale for attributing to her the cache of fentanyl seized on the day of her arrest: The cache, it argued, was reasonably foreseeable because she was Báez's girlfriend, worked closely with him, stayed at his home, was involved in taking orders and conducting sales, and delivered drugs for him.

After listening to the parties, the judge said that he was not going to adjust the PSR's Guidelines calculation because he believed that it was correct. He then imposed a downwardly variant sentence of 24 months of imprisonment. In the statement of reasons, a form issued after judgment is entered, he checked a box that said that he had adopted the PSR without change.

## II.

Ford advances two claims of error. First, she argues that the district court violated Federal Rule of Criminal Procedure 32(i)(3)(B) because it did not rule on her factual disputes about whether the cache of fentanyl found in Báez's home is attributable to her. Second, she argues that the court erred by attributing those drugs to her.

The parties disagree about the proper standard of review for Ford's Rule 32(i)(3)(B) claim. Because in the past we have reviewed such claims de novo, see, e.g., United States v. González-Vélez, 587 F.3d 494, 508-09 (1st Cir. 2009), Ford contends that de novo review applies here. The government counters that her failure to object below constrains us to review for plain error only. As we have done before, we leave this question for another day. See United States v. González, 736 F.3d 40, 42 (1st Cir. 2013) (reserving the question of which standard of review applies to an unpreserved Rule 32(i)(3)(B) claim because the claim failed even under de novo review). For "even under the more appellant-friendly lens of de novo review," her claim fails. See id.

Rule 32(i)(3)(B) requires a sentencing court to rule on factual disputes or conclude that a ruling is unnecessary because the court will not take the disputed matter into account when sentencing. Although the absence of explicit rulings does not always sound the death knell on appeal, judges should strive to make explicit rulings. See United States v. Romero, 906 F.3d 196, 210 (1st Cir. 2018). This facilitates appellate review and reduces unnecessary confusion about what happened below. But we will nonetheless uphold a Guidelines determination, even in the absence of explicit rulings, so long as the "record read as a whole 'reliably shows' that the judge implicitly resolved [the

- 7 -

defendant]'s objections against h[er]."  Id. (quoting United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017)).[2]

This case is on all fours with Romero.  In Romero, we held that the judge implicitly resolved the defendant's factual protests against the PSR's inclusion of a sentencing enhancement and rejection of a minor-role reduction because the judge stated on the record that he had read the PSR and parties' sentencing memos, listened to each side discuss the disputed issues, and adopted the PSR without change (as indicated in his statement of reasons).  Id.  Here, the same things happened:  The judge stated that he had read the PSR and parties' sentencing memos, listened to each side discuss its take on Ford's role in the conspiracy, stated that the PSR's Guidelines calculation needed no adjustment, and checked the box in his statement of reasons that said that he had adopted the PSR without change, which necessarily included its rejection of Ford's factual protests against attributing the cache of fentanyl to her.

Our dissenting colleague argues that we misconstrue

---

[2] The dissent states a more difficult standard to meet when there are no explicit rulings or findings, framing the standard for our review of the record for an implicit finding as "whether the 'sentencing record' compels a finding that the district court 'implicitly resolved' the disputed facts and ruled on the objected-to portions of the PSR at sentencing."  (emphasis added) (quoting Carbajal-Váldez, 874 F.3d at 783).  Our case law, however, is clear that our standard is whether the record "read as a whole 'reliably shows'" the implicit resolution.  Romero, 906 F.3d at 210 (emphasis added) (quoting Carbajal-Váldez, 874 F.3d at 783).

Romero because, in that case, there were "other indicia that the district court complied with Rule 32(i)(3)(B)." But the dissent distinguishes Romero based on considerations that played no role in our ultimate analysis. To be sure, we noted in Romero that the court (1) "arguably addressed Romero's minor-role-reduction request" by stating that his role in the organization was "very important" and (2) stated further that it was "not sure" whether Romero's objections mattered because of the government's below-Guidelines sentencing recommendation. 906 F.3d at 209-10. But we did not say that those statements helped show that the court had implicitly resolved Romero's objections. See id. Instead, we held that the record reliably showed that the court had "implicitly resolved Romero's objections against him" because it had adopted the PSR without change, which meant that it had "accepted the PSR's sentencing-range calculations, including its rejection of Romero's [objections]." Id. at 210. And we knew that the court had adopted the PSR without change "because of the judge's written statement of reasons." Id. So the dissent is rewriting what mattered in Romero to distinguish it from this case.[3]

_____

[3] The dissent also argues that our reliance on the district court's statement of reasons disregards Rule 32(i)(3)(B)'s text because the statement was not prepared "at sentencing." But the timing of the statement's preparation does not matter: We rely on it because it records what the court did at sentencing.

In the end, the dissent's disagreement with our analysis falls under its own weight. The dissent says that the facts that Ford disputed "underpinn[ed] the guidelines calculation" and

- 9 -

Setting aside this case's procedural similarity with Romero, Ford's arguments also show that the judge implicitly resolved her factual protests against her. She argues that the factual disputes "bore directly" on the Guidelines calculation and that the "judge's acceptance of the probation officer's treatment of [her factual] objections" led to her being held responsible for the cache of fentanyl found in Báez's home. So under her reasoning, by adopting the PSR without change, the judge necessarily resolved the factual disputes against her.

One final point. Although the case law above suggests that even a minimal indication that the judge implicitly resolved the factual disputes is sufficient to avoid remand, we remind district courts that Rule 32(i)(3)(B) requires them to rule on the factual disputes (or explain why they need not rule on them): The district court "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider

_____

"underl[ay] . . . the attribution analysis" in the PSR. If that is true, then what mystery is there about how the district court resolved those disputes when it adopted the PSR without change? The dissent's insistence that it is nonetheless necessary to remand for resentencing so that the court may clearly state on the record its resolution of Ford's factual disputes would "exalt form over substance" -- something we are rightfully "reluctant" to do. See Carbajal-Váldez, 874 F.3d at 783.

the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). As this court has said, the best practice is to make "explicit rulings." Romero, 906 F.3d at 210. While we have rejected Rule 32(i)(3)(B) claims, where, as here, the district court indicated that it had resolved the factual disputes by accepting or adopting the PSR, we are mindful that an outer boundary exists where the absence of any explanation will be insufficient as a matter of law.[4]

But in the end, the record here reliably shows that the judge implicitly resolved Ford's factual disputes about whether the cache of fentanyl is attributable to her. Thus, her Rule 32(i)(3)(B) claim fails.

---

[4] In the past, for example, we have remanded for clarification where the judge's failure to explicitly comply with Rule 32(i)(3)(B) frustrated appellate review. In Van, there were two ways that the defendant could qualify for a leadership enhancement under the Guidelines: the criminal activity had to either (1) involve five or more criminally responsible participants or (2) be otherwise extensive. United States v. Van, 87 F.3d 1, 2 (1st Cir. 1996). The PSR initially included the enhancement on the ground that the criminal activity involved five or more criminally responsible participants. Id. But when Van disputed that "Michael" was a criminally responsible participant (and thus that there were at least five), the probation officer responded that, even if there were not five, the criminal activity was "otherwise extensive." Id. at 2-3. Because the probation officer did not specify on which ground the PSR relied, the judge's adoption of the PSR did not reveal how he had resolved the disputes about Michael's criminal culpability. Id. at 3-4. Making matters worse, the undisputed facts did not compel a finding that either Michael was criminally responsible or that the criminal activity in general was "otherwise extensive." Id. at 4. So the uncertainty over which ground the judge had adopted frustrated our review. Here, in contrast, the PSR sets forth a consistent explanation for why the cache is attributable to Ford.

**B.**

Ford claims next that the judge erred by attributing to her the cache of fentanyl found in Báez's home.  The parties agree that she preserved this claim.  Preserved claims that the judge erroneously attributed drugs to the defendant are reviewed for clear error.  Soto-Villar, 40 F.4th at 33.  "Under this deferential standard," we must accept the judge's drug-quantity finding "unless, on the whole of the record, we form 'a strong, unyielding belief that a mistake has been made.'"  Id. (quoting United States v. Cintrón-Echautegui, 604 F.3d 1, 6 (1st Cir. 2010)).

The amount and type of drugs involved in a drug-trafficking conspiracy play a key role at sentencing.  Id. at 31.  Indeed, they generally control a defendant's base-offense level.  See USSG § 2D1.1(a).  Drugs are attributed to a defendant based on her "count(s) of conviction" and relevant conduct.[5]  Soto-Villar, 40 F.4th at 31.  Relevant conduct, "in the case of a jointly undertaken criminal activity," includes "all reasonably foreseeable acts and omissions of others in furtherance of the

---

[5] Criminal liability and sentencing liability are not always the same.  "While a conspiracy charge may encompass all acts by co-conspirators in furtherance of the conspiracy, 'relevant conduct' is limited to the foreseeable acts resulting from the defendant's particular agreement.  Thus, the scope of relevant conduct is 'not necessarily the same as the scope of the entire conspiracy.'"  United States v. Laboy, 351 F.3d 578, 583 (1st Cir. 2003) (citation omitted) (quoting USSG § 1B1.3, cmt. (n.2)).

jointly undertaken criminal activity." Cintrón-Echautegui, 604 F.3d at 5 (quoting USSG § 1B1.3(a)(1)(B)). So a defendant "is responsible not only for the drugs [s]he actually handled but also for the full amount of drugs that [s]he could reasonably have anticipated would be within the ambit of the conspiracy." United States v. Cortés-Cabán, 691 F.3d 1, 27 (1st Cir. 2012) (quoting United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004)).

Ford does not challenge being held responsible for the drugs involved in the controlled purchases that she participated in. She challenges only the judge's finding that the cache of fentanyl found in Báez's home on the day of her arrest constitutes relevant conduct and is thus attributable to her. But before we review the judge's finding, we need to resolve a dispute about the facts that he could rely on in making that finding: Ford argues that he could not rely on the non-PSR information in the government's sentencing memo because she contested it. She is right, in part.

"[A] sentencing judge, in her substantial discretion, can consider any evidence with sufficient indicia of reliability and can rely upon 'virtually any dependable information.'" United States v. Berríos-Miranda, 919 F.3d 76, 81 (1st Cir. 2019) (quoting United States v. Doe, 741 F.3d 217, 236 (1st Cir. 2013)). These principles apply with full force to drug-quantity findings. Cintrón-Echautegui, 604 F.3d at 6. The government's statements,

"not adequately challenged by defense counsel who has a full opportunity to respond, may constitute reliable information" for sentencing purposes.  United States v. Montalvo-Febus, 930 F.3d 30, 34 (1st Cir. 2019) (quoting United States v. Díaz-Arroyo, 797 F.3d 125, 130 n.3 (1st Cir. 2015)).

Díaz-Arroyo illustrates this point.  Díaz appealed his sentence for being a felon in possession of a firearm.  The PSR noted that he had been charged with murder and attempted murder and that those charges had been dismissed.  Díaz-Arroyo, 797 F.3d at 127.  But the PSR did not say why they were dismissed.  Id.  At sentencing, the prosecutor recommended a top-of-the-Guidelines sentence.  Id.  She explained that the charges "were dropped only after the sole surviving witness to the incident (a minor who was able positively to identify the defendant as the shooter) was threatened and fled the jurisdiction."  Id.  In response, defense counsel maintained the defendant's "innocence with respect to those charges" and stated that "the charges had been dropped because the witness had been in witness protection and did not appear to testify."  Id.  On appeal, we held that the court was "entitled to take into account the prosecutor's representations" about why the charges had been dismissed because defense counsel "did not directly challenge [her] account of the circumstances surrounding the[ir] dismissal."  Id. at 130 n.3.  So, too, here.

At the sentencing hearing, Ford challenged only the call

- 14 -

where Báez talked to his son about her role in getting the money to pay a coconspirator for a half kilogram of cocaine. To be sure, she generally objected to the information in the government's sentencing memo on the grounds that it was not in the PSR and that she should not have to rush to check it the day before sentencing. But a sentencing court is not limited to the information in the PSR. See Doe, 741 F.3d at 236. And she did not say that she needed more time, let alone ask for more time, to review the non-PSR information. See United States v. Mathur, 624 F.3d 498, 508 (1st Cir. 2010) ("[A] defendant's claim of unfair surprise at sentencing is 'severely undermined, if not entirely undone, by his neglect to ask the district court for a continuance to meet the claimed exigency.'" (quoting United States v. Díaz-Villafañe, 874 F.2d 43, 47 (1st Cir. 1989))). Because Ford did not "directly challenge" the non-PSR information in the government's sentencing memo -- besides, perhaps, the call about the large cocaine transaction[6] -- the judge could rely on it. See Díaz-Arroyo, 797 F.3d at 130 n.3. And because the government argued that the information supports a finding that the cache of fentanyl is attributable to her, and the judge made that finding, we will

_____

[6] We need not decide whether the judge could rely on this call after Ford's objection. Based on this record, we fail to discern how her precise role in getting the money for a large cocaine purchase from a coconspirator could have affected the judge's decision as to whether the cache of fentanyl is attributable to her.

- 15 -

factor that information into our review. See United States v. Jiménez-Beltre, 440 F.3d 514, 519 (1st Cir. 2006) (en banc), abrogated on other grounds by Rita v. United States, 551 U.S. 338 (2007) ("[A] court's reasoning can often be inferred by comparing what was argued by the parties or contained in the pre-sentence report with what the judge did.").

There is no clear error in the judge's decision to hold Ford responsible for the cache of fentanyl in Báez's home. The judge could reasonably find that Ford had agreed with Báez to distribute a heroin-fentanyl mixture on an ongoing basis. The judge could also reasonably find that Báez's possession of the cache was in furtherance of that agreement and reasonably foreseeable to Ford. There are two calls in the record, almost one year apart, where Báez told customers who wanted to buy a heroin-fentanyl mixture either to call Ford or that Ford would deliver the mixture to them. Following the first call, Ford delivered 2.5 grams of that mixture to a cooperating witness. The second call took place only three days before Ford was arrested in Báez's home, where the cache of that mixture was found. So the judge could reasonably infer that Ford and Báez regularly dealt in a heroin-fentanyl mixture, including at the time of their arrest, and therefore that it was reasonably foreseeable to her that he had a cache of that mixture awaiting distribution. Indeed, the judge could even infer that Ford knew that Báez kept the cache in

- 16 -

his home because she warned him when state troopers went by there with a drug-sniffing dog. See Cintrón-Echautegui, 604 F.3d at 7 ("[T]he court is entitled to draw reasonable inferences from information . . . in the sentencing record."). It follows that, under a reasonable view of the record, Báez's possession of a heroin-fentanyl mixture in distributable quantities in his home was within the scope of Ford's conspiracy agreement, in furtherance of it, and reasonably foreseeable to her. Where, as here, a view of the record is reasonable, there can be no clear error in the judge's decision to adopt it. United States v. Martin, 749 F.3d 87, 92 (1st Cir. 2014).

Ford's flagship argument about why she should not be held responsible for the cache of fentanyl in Báez's home has clay feet. She contends that her relationship with Báez does not automatically make her responsible for everything that he did. But that is not what happened here. To be sure, merely being in a relationship with someone does not show that one agreed to participate in the other's illicit activities. See United States v. Candelaria-Silva, 714 F.3d 651, 657-58 (1st Cir. 2013). Given the evidence about her role in the conspiracy, however, she is not being saddled with Báez's bad acts merely because she was dating him. And to the extent that she argues that she cannot be held responsible for the cache because the record does not show that she knew about it, that argument is a non sequitur. Reasonable

- 17 -

foreseeability is broader than knowledge. United States v. Pinkham, 896 F.3d 133, 137 (1st Cir. 2018). Because Báez's possession of the cache of fentanyl with intent to distribute it was reasonably foreseeable to Ford, committed within the scope of the conspiracy that she had agreed to, and in furtherance of that conspiracy, she is responsible for it.

As for the drugs inside the purse in the bedroom that Ford used, those are attributable to her, too. Because those drugs were also a mixture of heroin and fentanyl and were in the same house as the cache, the judge could reasonably infer that they were once part of the cache.[7] Because the cache is attributable to Ford, it does not matter that she (or someone else) later removed some of it for personal use. See Pinkham, 896 F.3d at 138; see also United States v. Marks, 365 F.3d 101, 105-06 (1st Cir. 2004) (holding that drugs the defendant consumed were nonetheless attributable to him because he had acquired them "with the intent that [they] would or could be distributed"). In any event, the 1.35 grams in the purse do not matter. Subtracting them from Ford's total drug weight leaves her with the same base-offense level (405.6 kg total converted drug weight minus 3.39 kg

---

[7] Ford tries to distance the drugs in the purse from the drugs in the cache by pointing out that, although both are a mixture of heroin and fentanyl, they had different additives. But the judge could reasonably infer that Báez's drug-trafficking organization did not have the type of quality control that would ensure each gram is identical.

converted drug weight equals 402.21 kg total converted drug weight).  See USSG § 2D1.1(c)(7) (providing that "[a]t least 400 kg but less than 700 kg of Converted Drug Weight" results in a base-offense level of 26).  Moreover, we see no indication in the record that removing the drugs in the purse from consideration would have impacted Ford's sentence.  So any error as to the attribution of the drugs in the purse would be harmless.  See Romero, 906 F.3d at 210-11 (stating that a harmless error "provides no basis for upsetting the sentence").

## III.

For the reasons above, we **affirm** Ford's sentence.


**-Dissenting Opinion Follows-**

**MONTECALVO, <u>Circuit Judge, dissenting</u>**. By finding, on this record, that the district court met its Rule 32(i)(3)(B) obligations to resolve controverted matters at sentencing that are material to the court's analysis, I believe the majority's interpretation of the rule is at odds with its plain text and in tension with its procedural objective. Not only does this interpretation undercut Rule 32(i)(3)(B)'s purpose by making it an ineffective procedural safeguard against a sentence based on unsupported allegations, it also disincentivizes the record development necessary to effectively review the procedural reasonableness of a sentence on appeal. Consequently, I disagree with the majority's conclusion that the record reliably shows that the district court implicitly resolved the material factual disputes at sentencing, as required by Rule 32(i)(3)(B). For this reason, I respectfully dissent.

This case turns on the scope of the district court's obligation under Rule 32(i)(3)(B) to resolve disputed material facts at sentencing. It is well-settled that "[w]hen a fact in the PS[R] is disputed, a district court must resolve the dispute so long as the fact may affect the court's sentencing determinations." <u>United States</u> v. <u>De Jesús-Torres</u>, 64 F.4th 33, 40 (1st Cir. 2023). Though disfavored, this resolution can be implicit "when the court's statements and the sentence imposed show that the facts were decided in a particular way," leaving no

ambiguity as to the factual record considered at sentencing. United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996). Because the court made no express rulings on the disputed facts in this case, the question before us is whether the "sentencing record" compels a finding that the district court "implicitly resolved" the disputed facts and ruled on the objected-to portions of the PSR at sentencing. United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017); see also Van, 87 F.3d at 3.

This is where I part ways with the majority's analysis. The majority views our decision in United States v. Romero, 906 F.3d 196 (1st Cir. 2018), as directing its conclusion that the district court implicitly resolved the contested facts underpinning Ford's objections to the PSR. I disagree.

Here, the parties agree that the district court made no explicit findings on (i) the drug quantity attributable to Ford or (ii) the various subsidiary factual disputes bearing on that attribution analysis.[8]

---

[8] Ford raised the following objections to facts contained in the PSR (i) whether Ford was Baez's "live-in girlfriend"; (ii) the nature of Ford's involvement in the conspiracy and, in particular, the meaning of Probation's factual statement that Ford was a "runner of Pedro Baez's narcotics trafficking business"; and (iii) whether the drugs recovered from a purse in the upstairs bedroom belonged to Ford. At sentencing, Ford also disputed the government's characterization of a recorded phone call that it introduced for the first time in its sentencing memorandum.

The sentencing hearing transcript is also clear that the full extent of the district court's discussion of these issues at sentencing was its conclusion that "I am not going to adjust the guidelines. I think they're properly calculated."

Determining whether the court implicitly resolved these disputes in a particular way requires us to ask if adoption of the PSR's guidelines calculation -- taken with knowledge that the district court read the PSR and the parties' sentencing memoranda and listened to the parties' arguments -- "eliminate[s] any guesswork about what facts the sentencing court envisioned as the basis for the [attribution of the disputed drug quantity]." Carbajal-Váldez, 874 F.3d at 784. On this record, I see no way of getting to yes. Here, where Ford's PSR objections disputed several material facts and legal conclusions underpinning the guidelines calculation, and where the full extent of the court's engagement with these issues was its adoption of the PSR's guidelines calculation without explanation, it seems evident that "[t]he PS[R] and the transcript of the [sentencing] hearing, taken together, [are not enough to] furnish clear guidance as to the basis on which" the district court concluded that attributing the disputed quantity to Ford was appropriate. See id. at 783-84 (holding the court's statement that it agreed with the guidelines calculation "coupled with the court's explanation that the captain enhancement was applied because the appellant 'acted as the captain

- 22 -

aboard the vessel which carried controlled substances,' makes manifest that the court impliedly adopted the findings contained in the PS[R]").

Perhaps recognizing this deficiency too, the majority opinion makes clear that the principal basis for finding the court implicitly ruled on the disputed portions of the record is not in the sentencing record.  Rather, the majority's conclusion turns on the fact that the district court "checked the box in his statement of reasons that said that he had adopted the PSR without change."  But the Statement of Reasons and Final Judgment are form documents that the district court completes after the sentence has been imposed, outside the presence of the defendant, and as part of a closed administrative process.  Meanwhile, Rule 32(i)(3)(B) expressly refers to the court's obligation to resolve disputes "at sentencing," whether by express statement or implicit reference, and for good reason: to ensure the court engages in the requisite factfinding in court and ahead of sentencing.  This not only safeguards defendants' constitutional right to a sentence predicated on reliable facts, but it also ensures that defendants can preserve their challenges to the factual findings -- and the

procedural reasonableness of the sentence -- for appeal.[9]  See United States v. Ramos-Carreras, 59 F.4th 1, 5 (1st Cir. 2023) ("[I]t is axiomatic 'that a convicted defendant has the right to be sentenced on the basis of accurate and reliable information, and that implicit in this right is the opportunity to rebut the . . . evidence and the information' to be considered by the court." (quoting United States v. Rivera-Rodríguez, 489 F.3d 48, 53 (1st Cir. 2007))); see also United States v. Berzon, 941 F.2d 8, 18 (1st Cir. 1991) ("Fed. R. Crim. P. 32 . . . 'embodies the

---

[9] Procedural safeguards, like Rule 32(i)(3)(B), are not just technical rules that guide the flow of a proceeding.  They are part of a complex web of requirements that together guarantee defendants a fundamentally fair hearing, as required by the Due Process Clause of the Fifth Amendment, and safeguard the integrity of an appeal.  See United States v. Berzon, 941 F.2d 8, 18-20 (1st Cir. 1991).

Here, it is undisputed that the court adopted Probation's guidelines calculation and therefore that it concluded that the disputed drug quantity was attributable to Ford.  The issue is that we do not know which facts the court relied on in reaching its conclusion.  The alleged facts the court might have relied on include Ford's relationship to Baez, the PSR's characterization of Ford as a "runner of Pedro Baez's narcotics trafficking business," the phone calls introduced in the government's sentencing memo, the drugs in the purse alleged to belong to Ford, or some combination of these facts.  Because various combinations of these facts could have led the court to adopt Probation's guidelines calculation, it is difficult to tell which of these factual disputes, if any, the court implicitly resolved by attributing the disputed quantity to Ford.  And where, as here, there are several disputed facts, each of which may or may not have factored into the court's attribution finding, knowing that information is critical for our review on appeal.

congressional intent to assure a defendant's due process rights in the sentencing process.'" (quoting United States v. Curran, 926 F.2d 59, 61 (1st Cir. 1991))).

The majority asserts that Romero directs its conclusion. But I do not read Romero to say that the mere notation of the court's adoption of the PSR without change in the later-filed Statement of Reasons alone suffices as a basis for finding that the court implicitly resolved the objections to the PSR and thus complied with Rule 32(i)(3)(B). This is because the record in Romero has other indicia that the district court complied with Rule 32(i)(3)(B).

First, the Romero court noted that "the judge arguably addressed Romero's minor-role-reduction request at sentencing when he said he 'agree[d] with the government's characterization that . . . Romero's role was very important in the organization.'" 906 F.3d at 209-10. This factual finding alone was likely a sufficient basis for concluding the court complied with its fact-finding obligations under Rule 32(i)(3)(B).[10]

---

[10] In Romero, we also noted that the district court -- after acknowledging Romero's objections to the PSR -- told the parties that it was "'not sure that those objections' were 'all that relevant,' since the government's proposal was 'below' what Romero would get if he sustained the objections and reduced the offense level." 906 F.3d at 203. Though not a focus of our decision in Romero, this statement is arguably a sufficient basis for finding the district court had complied with Rule 32 by implicitly "determin[ing] that a ruling is unnecessary . . . because the matter will not affect sentencing." Fed. R. Crim. P. 32(i)(3)(B).

Second, and perhaps more importantly, Romero objected to the PSR's application of the obstruction of justice enhancement and rejection of the minor-role reduction based on the undisputed facts as stated in the PSR. Id. at 210-11. Nothing in our decision indicates that Romero was challenging the reliability of the underlying facts themselves. Ford, on the other hand, objected to the factual accuracy of material information in the PSR, including facts Probation later added in its responses to her objections.

Therefore, the question before the court in Romero more closely resembled a question of law -- whether the district court implicitly ruled on whether Probation's application of the enhancement/reduction was in accord with the law in light of the undisputed facts. See id. at 210-11. Whereas here, we are dealing with a dispute about the underlying facts material to the attribution analysis. Without knowing how or whether the district court resolved the factual disputes, we cannot effectively review the legal conclusion as to attribution on appeal. And checking a box on the Statement of Reasons noting the court's adoption of the PSR without change is neither a substitute for resolving disputes at sentencing nor a reliable basis for inferring resolution of the facts in a particular way.

Aware of this issue and concerned that their decision could invite courts to improperly avoid their duty to resolve

material facts at sentencing, the majority wisely instructs district courts to "make explicit rulings" on factual disputes at sentencing notwithstanding its holding that "even a minimal indication that the judge implicitly resolved the factual disputes is sufficient to avoid remand." But such an admonishment is of little use where the court's decision simultaneously affirms based on a sentencing record that even when read as a whole lacks minimal indicators -- let alone a reliable showing that the judge implicitly resolved the disputed facts. And I fear that the court's decision today will hinder our ability to enforce, as a procedural matter, the need for district courts to make clear findings at sentencing, as well as lower the bar for concluding that the "record read as a whole 'reliably shows' that [a] judge implicitly resolved" objections against a defendant. See Romero, 906 F.3d at 210.

In sum, by overlooking the differences in what the specific objections in Romero were and how the district court in Romero engaged with them, and instead treating the record here as "on all fours with Romero," I am concerned that the majority has significantly narrowed the district court's obligations to resolve factual disputes at sentencing. In doing so, it has diminished an important procedural protection by making it harder to ensure that defendants are sentenced based on reliable evidence.

For all these reasons, I would vacate the sentence and remand to the district court with instructions to (i) state clearly on the record the factual basis for the court's decision on attribution and (ii) resentence in light of the court's findings regarding the disputed facts relating to attribution.

I therefore respectfully dissent.